UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

MARK DAVID BAILEY,

                Petitioner,                    Case No. 1:09-cv-460

v.                                         Honorable Paul L. Maloney

BLAINE C. LAFLER,

                Respondent.
_____/

## REPORT AND RECOMMENDATION

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.

Petitioner is serving a life sentence, imposed by the Mecosta County Circuit Court on September

1, 2005, after a jury convicted Petitioner of first-degree murder, Mich. Comp. Laws § 750.316A.

      In his amended petition, Petitioner raises following grounds for relief:

I.      [PETITIONER] WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE AND PRESENT EVIDENCE OF A DIFFERENT KILLER WHEN THE ACTING JUDGE RULED THAT EVIDENCE OF A PRIOR MURDER WITH MANY SIGNIFICANT SIMILARITIES WAS INADMISSIBLE, WHEN PETITIONER WAS DENIED POTENTIALLY EXCULPATORY EVIDENCE AND EVIDENCE THAT WOULD HAVE SUPPORTED HIS ARGUMENTS AS A RESU[L]T OF A BRADY [Brady v Maryland, 373 US 83 (1963)] VIOLATION AND WHEN THE TRIAL JUDGE DID NOT STATE A LEGAL BASIS AND THE RULING WAS IN VIOLATION OF HOLMES v SOUTH CAROLINA, 547 US 319 (2006);

II.     [PETITIONER] WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL AND A FAIR TRIAL, WHEN, AS A RESULT OF INEFFECTIVE ASSISTANCE OF COUNSEL:

(1)     WITNESSES WHO WERE NOT QUALIFIED AS EXPERTS IN FOOTPRINT EVIDENCE GAVE HIGHLY PREJUDICIAL AND

> IMPROPER TESTIMONY BEYOND THE SCOPE OF THEIR KNOWLEDGE;
>
> (2)    EXPERTS REGARDING FOOTPRINT EVIDENCE WHO WOULD HAVE SUPPORTED THE DEFENDANT'S CLAIM OF INNOCENCE, YET AGREED NOT TO HAVE THEM TESTIFY; AND
>
> (3)    ALTHOUGH DOG TRACKING EVIDENCE WAS ADMITTED BY SEVERAL WITNESSES, THE STANDARD JURY INSTRUCTION WAS NEVER GIVEN[.]
>
> III.    PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHERE THE TRIAL COURT ALLOWED THE USE OF IMPROPER BAD ACT EVIDENCE WHICH WAS USED FOR AN IMPROPER PURPOSE[.]
>
> IV.    PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO PRESENT A COMPLETE DEFENSE WHEN, AFTER SIXTEEN (16) YEARS, A KEY WITNESS' STATEMENT WAS NOT ALLOWED IN PURSUANT TO MRE 803(24)[.]
>
> V.    PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF HIS SIXTH AMENDMENT AND HIS ABSOLUTE RIGHT TO PRESENT A DEFENSE WHEN THE TRIAL COURT IMPROPERLY LIMITED THE CONTENT OF DEFENSE COUNSEL'S CLOSING ARGUMENT[.]

(Br. in Supp. of Am. Pet., ECF No. 58, PageID.436-37.)  Respondent has filed an answer to the petition (ECF No. 6) and to the amended petition (ECF No. 67), stating that the petition should be denied because Ground I, II and IV are meritless, and Grounds III and V are not cognizable or are procedurally defaulted.  Upon review and applying the AEDPA standards, I find that Grounds I through IV are without merit and that Ground V is procedurally defaulted.  Accordingly, I recommend that the petition be denied.

- 2 -

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from the killing of seventy-nine year old Mary Pine in her home in Big Rapids, Michigan, on February 15, 1989.  The case remained unsolved for over 15 years until Petitioner confessed details about the offense to his cell mate in 2003.  Petitioner was tried before a jury over nine days, beginning on July 18, 2005, and concluding on July 29, 2005.[1]

At trial, Randall Craig Los, a police officer for Big Rapids, testified that on the evening of February 15, 1989, he received a dispatch to visit 216 Gilbertson Street in Big Rapids.  (Tr. II at 48-49.)  When he arrived, the doors were locked but he could see a body lying on the floor.  (*Id.* at 54.)  He entered the house, and in the dining area he noticed a puddle of blood and a potted plant on the floor.  (*Id.* at 56.)  He found a rolling pin on the floor with both handles broken off and a butcher knife with a broken blade.  (*Id.* at 57.)  When he looked in the bathroom adjacent to the dining room, he saw Ms. Pine lying on the floor with what appeared to be a stab wound on the back of her head.  (*Id.* at 56, 61.)  He also discovered  an open wallet on the floor and an open purse in the back bedroom.  (*Id.* at 61, 63.)  Sometime after calling for backup, Officer Los learned that Ms. Pine's vehicle was missing.  (*Id.* at 68.)

---

[1]Transcripts of the trial proceedings will be designated as follows:
July 18, 2005 (ECF No. 11):  "Tr. I at ___."
July 19, 2005 (ECF No. 12):  "Tr. II at ___."
July 20, 2005 (ECF No. 13):  "Tr. III at ___."
July 21, 2005 (ECF No. 14):  "Tr. IV at ___."
July 22, 2005 (ECF No. 15):  "Tr. V at ___."
July 26, 2005 (ECF No. 16):  "Tr. VI at ___."
July 27, 2005 (ECF No. 17):  "Tr. VII at ___."
July 28, 2005 (ECF No. 18):  "Tr. VIII at ___."
July 29, 2005 (ECF No. 19):  "Tr. IX at ___."

Joyce Durdell, Ms. Pine's daughter, testified that her mother drove a tan vehicle, either a Plymouth Reliant or some other Chrysler automobile.  (*Id.* at 90.) After the police completed their investigation in her mother's home, Ms. Durdell cleaned it up to prepare it for sale.  While she was cleaning, she found an ink pen with the words "Pet Palace" written on it.  (*Id.* at 95.)  Her mother did not own any pets and, according to Ms. Durdell, did not have any reason to go to Pet Palace. (*Id.* at 94.)

Kenneth Laninga worked for the latent fingerprint unit of the Michigan State Police Crime Laboratory from 1981 until 1992.  (*Id.* at 100.)  He videotaped the crime scene on the evening of February 15, 1989.  In the video, he identified an electrical cord that was wrapped around the victim's neck.  (*Id.* at 106.)  He also identified "footwear impressions" in the snow by the back of the house.  (*Id.* at 111.)

Dr. Stephen Cohle testified as an expert in forensic pathology.  Based on his review of the autopsy report and photographs of the victim's body, he opined that there were two primary causes of death:  massive head injuries and a stab wound in her back which penetrated her heart.  (*Id.* at 169.)  With regard to her head injuries, he opined that she was hit on the head at least five or six times with something very hard, like a rolling pin.  (*Id.* at 174-75, 177.)  In addition, he identified twelve stab wounds on her face, chest, back and buttocks.  (*Id.* at 177.)  Many of the stab wounds appeared to have been inflicted with a knife, but two of them appeared to have been inflicted with a two-pronged fork.  (*Id.* at 178.)  All of the injuries that Ms. Pine sustained could have been inflicted within a time span of ten minutes to several hours.  (*Id.* at 181.)

Victor Martin worked as a dog handler and tracker for the Michigan State Police.  (*Id.* at 202.)  He was called to the crime scene on the evening of February 15, 1989, in order to assist with

tracking.  Martin went to the door of the house and found fresh tracks in the snow leading to the driveway, indicating that the suspect had walked around the vehicle before entering through the driver's side door.  (*Id.* at 210-11.)  The tracks appeared to be fresh because they were "well cut" and they had a "pattern" to them.  (*Id.* at 211.)  Martin testified that he uses a person's "gait" to help identify a set of tracks; gait refers to a consistent length in a person's stride.  (*Id.*)  He also observes the pattern of the shoe prints, as he did for those around Ms. Pine's home.  (*Id.* at 212.)  He and another officer, Charlie Loader, were not able to find any tracks leading away from the scene using their dogs, so they put the dogs away.  (*Id.*)  However, he and Officer Loader followed a set of tracks in the snow leading toward the house, coming from a store called the Corner Market, a few blocks away. (*Id.* at 217-20.)  They lost the trail near the store and then picked it up again and followed it to a home occupied by the Wellmans.  (*Id.* at 229.)

A day or two after the murder, Sean Newman was riding his snowmobile near a gravel pit in Big Rapids when he discovered a vehicle that fit the description of the victim's car.  (Tr. III at 59.)  He and his friends contacted the police.  Newman knew Petitioner from when they were growing up, and he recalled seeing Petitioner at the gravel pit when they were younger.  (*Id.* at 64.)

James Cook, who was the Deputy Sheriff for Mecosta County, received a dispatch on February 16, 1989, regarding a vehicle that was discovered at the gravel pit.  (*Id.* at 68.)  He verified that it belonged to the victim.

Melody Panek worked for Mike's Market in Big Rapids.  One morning in April 1989, she discovered that the store had been broken into, cash was taken from the register, and items were stolen from the shelves.  (*Id.* at 76.)  She had met Petitioner just a few weeks prior to that time, after he stopped by the store to purchase a candy bar.  (*Id.* at 78.)  She suspected that Jesse Wellman was

responsible for the burglary because a day or two earlier she had seen him knocking on the wall in the same spot where the burglar had broken the drywall to gain entrance into the store. (*Id.* at 79.)

Jess Vliet, a police officer in Big Rapids, investigated the burglary at Mike's Market. (*Id.* at 84, 86.) In connection with that investigation, he executed a search warrant on Petitioner's residence, where he discovered many items that had been taken from the store. (*Id.* at 88.)

Rollie Uebele, a parole and probation officer for Mecosta County, interviewed Petitioner in connection with a pre-sentence investigation report regarding the burglary. (*Id.* at 92.) Petitioner admitted to Uebele that he entered Mike's Market, took items from the store, and brought them back to his apartment. (*Id.* at 93.) Petitioner told him that he did it because he lost his job at Pet Palace, which was his father's pet store. (*Id.* at 94-95.)

Brian Kelly testified that he hired Petitioner to mow the lawn of his home in the summer of 1986. (*Id.* at 98.) Sometime thereafter, Kelly learned that his home had been burglarized. After he confronted Petitioner about it, Petitioner admitted breaking into the home on two occasions. (*Id.* at 99.) On cross-examination, Kelly indicated that Petitioner never acted antagonistic or belligerent toward him. (*Id.* at 101.)

Brian's former wife, Laurie Kelly, confirmed that her husband had hired Petitioner to mow the lawn of their home, and that their home was broken into on several occasions during the daytime. (*Id.* at 105-07.) She discovered the burglary when she noticed that a basement window was partially open. (*Id.* at 106.) Several bottles and cans were missing, as well some money and a piggy bank containing $68.00. (*Id.*) After she confronted Petitioner about it, he admitted to taking the money. (*Id.* at 105-07, 112.) On cross-examination, she indicated that Petitioner was never rude to her, and that he backed away when she confronted him. (*Id.* at 112.)

Robert King also lived in Big Rapids in 1986, and he also hired Petitioner to mow his lawn. (*Id.* at 118.) Over the course of a month, he discovered that someone was entering his home. He setup a video camera, which recorded Petitioner entering his home during the daytime. (*Id.* at 122.) Some cash and a jar of coins were taken. (*Id.*) When King confronted Petitioner about it, Petitioner initially denied responsibility. After King showed him the videotape, Petitioner became quiet. On cross-examination, King described Petitioner as being polite, and stated that Petitioner never showed any hostility toward him. (*Id.* at 125-26.)

Michael Monica testified that he was a friend of Petitioner's and participated in several of the burglaries with Petitioner. (*Id.* at 132-35.) On cross-examination, Monica testified that he knew Petitioner over a period of 2 years, that he spent a lot of time with Petitioner in the summer of 1986, and that he never saw any violent tendencies in Petitioner. (*Id.* at 138.)

Officer Gary Truszkowski testified as an expert in footwear identification. (*Id.* at 152.) He obtained footwear impressions from the snow outside the victim's home and determined that they were consistent with shoes seized from Petitioner. (*Id.* at 181.) The prosecutor asked Truszkowski about a report prepared by another expert, Dr. Frederick, who examined photographs of the footwear impressions and compared them to Petitioner's shoes. In the report, Dr. Frederick expressed concern that a "lateral mark" on one of the shoes was not depicted in one of the photographs. (*Id.* at 188.) Truszkowski testified that he would not be surprised if the photographs did not show the mark because it was too fine to make much of an impression. (*Id.* at 189.) Truszkowski also testified that Dr. Frederick's background is in product design and the biomechanics of shoes rather than forensics. (*Id.* at 190.) At this point in the trial, Petitioner's counsel asked to address the court. Counsel asserted that he made an agreement with the prosecutor not to have Dr. Frederick testify, but to offer

Frederick's report into evidence; it was counsel's understanding that the prosecutor's expert would testify only as to the contents of his own report. (*Id.* at 192.) Petitioner's counsel objected to Officer Truszkowski's commentary on Dr. Frederick's report and Dr. Frederick's background. Counsel indicated that he would need to call Dr. Frederick as a witness as well as a FBI expert. After a colloquy with the court and discussion between counsel, the attorneys agreed to offer Dr. Frederick's report and the report of the FBI expert into evidence, but not to call them as witnesses. Petitioner agreed to this arrangement. (*Id.* at 203.)

On cross-examination, Truszkowski clarified that the finding in his report was that there was a lack of sufficient clarity and detail in the footwear impression to make a positive identification or elimination, and that Dr. Frederick's report and the FBI report came to the same conclusion. (*Id.* at 223-24.)

Kevin Streeter, a forensic scientist, examined the victim's vehicle after it was discovered by the police. In it, he found hairs in three areas of the car, seized three of them, and turned them over to the lab. (*Id.* at 233-34.)

Detective Richard Miller assisted with the investigation of evidence at Ms. Pine's home. Sometime after he arrived at the home on the evening of February 15, 1989, two other police officers at the scene pointed out a set of tracks in the snow. (Tr. IV at 6, 7.) Miller followed the tracks and discovered that they originated near the Corner Market, and then crossed a field, went to the front of the victim's house, around the corner, into an alleyway behind the house, and then up through the backyard. (*Id.* at 7.) Miller also followed a similar set of tracks leading from Jesse Wellman's home to the Corner Market. In the course of following the foregoing tracks, Miller became familiar with the "tread pattern" and the "gait" or "manner" in which the person walked. (*Id.* at 8.) A photograph

was taken of one of the tracks, next to a ruler.  (*Id.* at 9.)  Miller used this photograph when trying to find the same tracks in the days following the homicide.

Miller interviewed several individuals, including John Lee, a neighbor of the victim.  In Miller's opinion, Mr. Lee's footwear and foot size did not match the tracks leading to Ms. Pine's home.  Miller also interviewed Jesse Wellman several times.  Wellman allowed Miller to search his home for footwear, but Miller did not find anything that matched the foot tracks.  On the evening of February 16, Miller went to the area where the victim's car was discovered.  At that location, he found tracks leading away from the vehicle that, in his opinion, were similar to the tracks that were around the victim's home.  (*Id.* at 15-16.)  He followed them to a nearby street but could not follow them any further because it was getting dark.  The next day, he and another detective continued following those tracks down several streets but then lost the trail when the tracks were headed toward the river, in the direction of Petitioner's residence.  (*Id.* at 17-18.)

Miller found tracks with a similar "tread wear" pattern on two other occasions.  (*Id.* at 19.)  Three days after the murder, he found a set of tracks on Colburn Street and another set on Oak Street.  The set on Colburn Street did not look quite the same as the one found outside the victim's home, because it was a different size.  A couple of days later, he connected these tracks to a college student named Douglas Chapman.  Chapman owned a pair of Nike shoes that Miller believed was responsible for the tracks.  Miller believed that Chapman's shoes were too large to create the tracks around Ms. Pine's home.  (*Id.* at 22.)  Also, there was a cut or mark on the heel of Chapman's shoe that did not match the suspect's tracks.  (*Id.*)

The prosecutor asked Miller whether Chapman's shoe could have created the impressions around Ms. Pine's home.  Petitioner's counsel objected that Miller cannot give an opinion on an

issue that is a matter for an expert.  In response, the court gave the prosecutor an opportunity to lay

a foundation for Miller's opinion.  Miller testified that he was familiar with the tracks found outside

Ms. Pine's home because he followed them for nearly a mile.  Also, he had a picture of them in his

hand.  The court then instructed the jury that "those things" that Miller "just said" were "used to

make his observations." (*Id.* at 25.)  He was not qualified as an expert, however, so "it would be an

observation as opposed to an expert opinion." (*Id.*)

Miller then testified that on February 17 or 18, he found other tracks in the neighborhood that

were similar to those found outside Ms. Pine's home and by her vehicle.  (*Id.* at 29.)  In his opinion,

these additional tracks were evidence that the killer had returned to the scene of the crime, trying

to observe the police investigation.  (*Id.* at 30.)

On re-direct examination, the prosecutor mentioned that he had not qualified Miller as an

expert in tracking.  He then asked Miller questions about his experience as a tracker.  Miller testified

that he tracked footprints on many occasions over the course of his 34-year career as a police officer.

(*Id.* at 36.)

Detective Steve Delaney worked for the Big Rapids Department of Public Safety.  On

February 14, 1989, he stopped a car that belonged to Petitioner.  Jesse Wellman was driving the car

and Petitioner was a passenger.  Delaney impounded the car because Petitioner did not have proper

registration.  According to Delaney, Petitioner and Wellman had just come from the Grunst gravel

pit.  (*Id.* at 116-17.)

The following year, Delaney executed a search warrant on Petitioner's mother's home for

personal belongings that Petitioner sent to his mother.  (*Id.* at 136.)  Among the items found was a

blue knit cap.  The cap was sent to the FBI crime lab, and it was determined that the threads of the

cap shared similar characteristics and properties as a fiber found on the wooden rolling pin in Ms. Pine's home.  (*Id.* at 140.)

Esther Wellman, Jesse Wellman's mother, saw Petitioner and Jesse together the day before the murder.  Petitioner stayed at her house that evening.  (*Id.* at 152.)

Rollie Uebele was employed as a probation officer for Mecosta County in 1989.  That year, he met with Jesse Wellman every third Wednesday.  He saw Jesse at around 1:00 pm on February 15, 1989.  (*Id.* at 184.)

Ryan Kowalczyk worked with Petitioner at Pet Palace from 1988 to 1990.  (*Id.* at 208.)  On the day of the murder, Kowalczyk and Petitioner worked the same shift, from 3:00 pm to 9:00 pm. Kowalczyk recalled Petitioner arriving later than his usual time.  Petitioner usually arrived at the store 20 minutes before the shift started, but on the day of the murder Petitioner was "rushed" and "almost late."  (*Id.* at 211.)  He seemed unusually "excitable."  (*Id.* at 212.)  Kowalczyk learned about the murder a day or two after it happened, when police came to the store to interview Petitioner and the store owner, Petitioner's father.  In the days that followed, Kowalczyk spoke about Ms. Pine's death with other store employees.  Petitioner usually did not take part in these conversations, except on one occasion when he stated in a joking manner, "Yeah, I did it, I'm the one who did it."  (*Id.* at 214.)  Kowalczyk noticed that Petitioner's behavior changed after the murder.  He did not seem himself.

Wendy Summersett worked at Movie Warehouse in Big Rapids in February 1989.  She recalled Petitioner coming into the store at around 10:00 pm on the night of the murder.  (Tr.V, 9.) She noticed something unusual about Petitioner, compared to the other times that he had been to the store.  He seemed "uneasy."  (*Id.* at 10.)  After Petitioner left the store, Summersett called her

husband, who was the manager of the store, to let him know that "something was not right."  (*Id.* at 11.)  Summersett had also seen Petitioner earlier that day, around 2:00 in the afternoon, driving a tan-colored, four-door vehicle.  (*Id.* at 12.)  The vehicle he was driving was similar to the one owned by the victim.  Summersett was interviewed by the police on February 16, 1989 and in September 1990.  On cross-examination, she conceded that she did not tell the police at that time about seeing Petitioner driving a tan-colored vehicle.  (*Id.* at 16.)  In fact, she did not tell the police about it until the month prior to trial.  (*Id.* at 18.)

Ron Caserta was one of Petitioner's roommates at the time of the murder.  They had been living with David Solis in Big Rapids since the Fall of 1988.  Petitioner left their residence for a day or two and did not return until February 16, 1989.  (*Id.* at 92.)  Petitioner said that he had been with Jesse Wellman.  (*Id.*)  Caserta noticed a change in Petitioner's personality after the date of the murder.  One evening, Caserta was up late watching the television with Solis and they heard Petitioner screaming loudly in his sleep.  (*Id.* at 65.)

Harvey Bailey, Petitioner's father, testified that Petitioner worked for him at Pet Palace.  According to time records maintained by the store, Petitioner worked from 2:57 pm to 9:02 pm on February 15, 1989.  Mr. Bailey was aware that Ms. Pine had hired Petitioner to mow her lawn.  He also confirmed that his store had purchased pens with the name of the store printed on them.

Detective George Pratt assisted with the investigation of the murder.  When he arrived at Ms. Pine's home on the evening of February 15, 1989, he observed several tracks in the snow.  He looked at the tracks to determine the pattern of the imprint.  (*Id.* at 121.)  Early the next morning, he went to Petitioner's home and saw a partial footprint in the ice that appeared to contain the same pattern as a print that he saw in Ms. Pine's yard.  (*Id.* at 122-23.)  He did not take a picture of it.

When Ms. Pine's car was recovered from the gravel pit, Pratt went to the gravel pit and observed footwear impressions that were "similar" to the impressions that he saw behind Ms. Pine's house. (*Id.* at 129.)

Pratt interviewed Petitioner on two occasions, the first time was on February 16, 1989, the day after the murder.  During the first interview, Petitioner acknowledged that he did some yard work for Ms. Pine, and that he had been inside her house to use the restroom.  Petitioner told Pratt that the day before the murder he went over to Jesse Wellman's house, but Jesse was not home.  He drove around for a while and saw that Ms. Pine's driveway was not shoveled, so he got out and told her that he would shovel it for free, which he did.  That evening, he stayed at Jesse's house.  He remained there until around noon the following day, and then walked to Corner Market with Jesse.  Sometime thereafter, he went home, cleaned up, and walked to work.  He stopped at Movie Warehouse on the way to work in order to pay a late fee.

Pratt obtained a pair of Nike tennis shoes from Petitioner after a second interview with him on February 23.  In both interviews, Petitioner claimed that he had worn this pair of shoes when he shoveled Ms. Pine's driveway.  When Petitioner gave Pratt the shoes, however,  he claimed that he had not worn them.  (*Id.* at 137.)

Pamela Rozier worked at Pet Palace with Petitioner.  Sometime after Ms. Pine was killed, Petitioner asked Ms. Rozier if she had heard about the murder.  She said that she had, and he told that her he was the one responsible for it.  (*Id.* at 164.)  He claimed that he strangled Ms. Pine with a cord and stabbed her with a fork.  (*Id.*)  Ms. Rozier ignored Petitioner because she thought that he was joking.

Detective Delaney testified that he saved copies of all the newspaper articles and press releases generated regarding Ms. Pine's murder. (*Id.* at 174.) One of the details that the police never released to the public was that the killer used a two-pronged fork to stab Ms. Pine. (*Id.* at 175.)

Robert Gene Thompson was a cell-mate with Petitioner for about six months in 2003. (Tr. VI at 33.) Petitioner told Thompson that he did some odd jobs for an older lady in Big Rapids, including cutting grass and shoveling snow. (*Id.* at 35-36.) On one occasion, Petitioner saw her leave home, so he went into her house and started rummaging around to find some money. When he looked outside, he saw that she was pulling into the driveway. Petitioner hid behind a wall and waited for her to come inside. When she did, he hit her with a rolling pin. Then he went to the kitchen and got a knife and stabbed her with it. After that, he took her car and drove it to his father's business. On his way to work, a woman that he knew saw him driving the car. After he left work, Petitioner drove back to the woman's house to try and find some more money, but he saw police cars near her house, so he drove to a gravel pit. He wiped his fingerprints off the car and then ran home. Petitioner stated that the murder occurred between 1:30 and 2:30 pm, because he had to start work at 3:00.

David Samel, a state prisoner, testified that he met Robert Thompson in prison. (*Id.* at 158.) Thompson asked Samel to conduct some legal research because Thompson was looking for a way to get out. (*Id.* at 161.)

Judy Bennett was friends with Petitioner's parents, and had known Petitioner for several years prior to 1989. She owned Movie Warehouse with her husband. (*Id.* at 82.) On February 15 of that year, between 2:30 and 3:00 in the afternoon, she was driving through town to pick up her

daughter from school.  When she stopped at an intersection, she saw Petitioner driving a "nice" vehicle, a tan, four-door car.  (*Id.* at 89-90.)  She thought it odd that he would be driving such a new car because he was always saying that he did not have any money.  (*Id.* at 90.)  Later, she learned about the murder and the victim's stolen car, and recognized it as the car that Petitioner was driving that day.  (*Id.* at 94.)

On the seventh day of trial, the trial court heard several motions regarding evidence that the parties wanted to offer into the record.  The defense possessed a police report from the interview of a 10-year old boy, Brian Withers, who no longer recalled the events at issue.  The boy told the police in 1989 that he saw the victim come out of her house at 3:40 pm.  The boy's mother claimed that the interview was recorded, but the police could not find any evidence of a recording.  Defense counsel sought to have the police report read into the record or to have the court give an instruction that the absence of the recording should be construed in favor of the defendant.  The court denied the motion because Petitioner had not shown that the evidence was lost as a result of bad faith.  (Tr. VII at 28.)

To respond to the defense's questioning of other witnesses about whether Petitioner had been violent toward them, the prosecutor sought to present testimony that a woman reported to the police in 1991 that Petitioner had sexually assaulted her.  The Court denied the motion, finding that the evidence was more prejudicial than probative.  (*Id.* at 29.)  Because Petitioner had opened the door to questions about his propensity for violence, however, the Court ruled that defense counsel could not raise that issue in his closing argument.

At the conclusion of trial on July 29, 2005, the jury found Petitioner guilty of first-degree pre-meditated murder and first-degree felony murder.  (Tr. IX at 3.)  On September 1, 2005,

Petitioner was sentenced to a term of life in prison for one count of first-degree murder.  (Sentencing

Tr. 12, ECF No. 20.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel, raised Grounds I, II, III, IV and V of the amended petition, except for the *Brady* claim in Ground I.  (*See* Def.-Appellant's Br. on Appeal, ECF No. 21.)  In an unpublished opinion issued on June 26, 2007, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 6/26/2007 Mich. Ct. App. Op. (MCOA Op.), ECF No. 21.)

Petitioner filed an application for leave to appeal to the Michigan Supreme Court, raising the same grounds for relief.  On February 19, 2008, the Michigan Supreme Court denied leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 2/19/2008 Mich. Ord., ECF No. 22.)

### C.    Post-conviction relief

Petitioner filed the instant action in May 2009, raising the same five grounds for relief that were presented on appeal.  In October 2010, the Court granted Petitioner's motion for leave to amend the petition to include the *Brady* claim in Ground I.  The Court then stayed the action pending exhaustion of that claim in state court.  Petitioner subsequently filed a motion for relief from judgment in state court raising the *Brady* claim in Ground I.  The motion was denied.  Petitioner sought leave to appeal that decision, but the Michigan Court of Appeals and the Michigan Supreme Court both denied leave to appeal for failure to establish entitlement to relief.  The Michigan Supreme Court entered its order denying leave to appeal on June 25, 2013.  Petitioner then returned to this Court with his amended petition and a motion to reopen the case.  The Court granted the motion.  Respondent has filed an answer to both the original and the amended petitions.

- 17 -

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has

"drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits

in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372,

1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.

28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the

dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.

In determining whether federal law is clearly established, the Court may not consider the decisions

of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover,

"clearly established Federal law" does not include decisions of the Supreme Court announced after

the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the

inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan

state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. __, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state

standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### I. Right to Present a Defense / *Brady* violation

Ground I of the petition has two parts. Petitioner argues that he was denied the right to present a defense when the trial court prevented him from presenting evidence of another murder with similar characteristics. Petitioner also argues that the prosecution failed to disclose evidence from their investigation of this other murder. Respondent contends that both claims are without merit.

### A. Right to Present a Defense

Petitioner asserts that the trial court denied him due process by preventing him from presenting a complete defense. In 1980, approximately nine years before the death of Mary Pine,

89-year-old Stella Lintemuth was murdered in Big Rapids.  Her murder remained unsolved at the time of Ms. Pine's death.[2]  While conducting their investigation, the police noticed similarities between the two crimes and hypothesized that the same person might be responsible.  They asked the Department of State Police to prepare a profile of the killer based on the two events.  In a report dated April 4, 1989, the Department of State Police described a profile of the killer, noting that there were "several similarities" between the two murders.  (Dep't of State Police Rep. 4, Ex. Q to Def.-Appellant's Br. on App., ECF No. 22.)  In May of the following year, the FBI prepared a similar report comparing the two crimes and developing a profile of the killer.  The report reached the following conclusion:

> Based on similarities of these two crimes as set out above, and when considered with the size of the community and the proximity of the crimes to each other, it is our opinion that one offender is most likely responsible for both crimes.

(FBI Rep. 4, Ex. A to Def.-Appellant's Br. on App., ECF No. 71.)  Petitioner asserts that, if he had been allowed to present these reports, they would have shown that he was not guilty of the murder of Ms. Pine because he could not have committed both crimes.  He would have been only 10 years old when Ms. Lintemuth was killed.

The issue of whether to admit evidence regarding the Lintemuth murder arose during pre-trial proceedings.  At a motion hearing, the court ruled that evidence "regarding another murder of an elderly person when the defendant would have been about 10 years old . . . is not to be brought before the jury." (6/9/2005 Mot. Hr'g Tr. 6, ECF No. 10.)  On appeal, Petitioner argued that the trial

---

[2]Eventually, in 2007, Scott Graham was charged with killing Ms. Lintemuth.  According to Petitioner, Graham was later convicted based on fingerprints that were found at the scene of her death.

court deprived him of due process when it prevented him from presenting this evidence in support

of his defense, and failed to provide reasons for its decision.  The court of appeals rejected his claim:

> The issue of defense evidence of third-party guilt was addressed in *Holmes v South Carolina*, 547 US 319; 126 S Ct 1727; 164 L Ed 2d 503 (2006). The United States Supreme Court indicated that evidence tending to show that a person other than the defendant committed the charged crime may be introduced by the defendant when it is inconsistent with, and raises a reasonable doubt of, the defendant's guilt. *Id.* at 1733. The evidence should be excluded, however, when it is too remote, when it lacks a connection with the charged crime, when it can have no other effect than to cast a bare suspicion upon another, or when it raises merely a conjectural inference that another person committed the crime. *Id.*
>
> In *People v Kent*, 157 Mich App 780, 793; 404 NW2d 668 (1987), this Court stated that "evidence tending to incriminate another is admissible if it is competent and confined to substantive facts which create more than a mere suspicion that another was the perpetrator."
>
> Here, defendant is not relying on any direct evidence that another person committed the murder, e.g., someone else was seen driving the victim's car after the killing, someone else was seen entering the home, or someone else made an inculpatory statement. Rather, defendant is arguing that the 1980 murder indirectly shows that someone else committed the charged murder because the same perpetrator necessarily had to be involved in both killings, given the similarities between the crimes. While it may be arguable on some level, we find no abuse of discretion with respect to the trial court's evidentiary ruling. Under the circumstances presented, and considering the similarities between the crimes as well as the differences, a reasonable and principled decision would include one that finds nothing more than the creation of mere suspicion, a conjectural inference, excessive remoteness, or an inadequate connection. Accordingly, reversal is unwarranted.

(MCOA Op. 8-9.)

The foregoing decision was not contrary to, or an unreasonable application of, law

established by the Supreme Court.  The right to present a defense is well established:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process law.

- 22 -

*Washington v. Texas*, 388 U.S. 14, 19 (1967).  However, the right is "not unlimited"; it must "bow to accommodate other legitimate interests in the criminal trial process."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*,483 U.S. 44, 55 (1987)).  "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve."  *Id.* (internal quotations omitted).

In *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Supreme Court indicated that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  *Id.* at 326.  Evidence of third-party guilt "may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial[.]"  *Id.* at 327 (quoting  40A Am. Jur. 2d, Homicide § 286, pp. 136-138 (1999)).

The rule applied by the Michigan Court of Appeals in Petitioner's case, in which it is permissible to exclude evidence of third-party guilt where the evidence casts a mere suspicion that someone other than the defendant committed the offense, is "supported by the Supreme Court's decisions in *Scheffer* and *Holmes*."  *Berry v. Palmer*, 518 F. App'x 336, 342 (6th Cir. 2013).  Moreover, the state court reasonably concluded that the probative value of the police reports, which merely cast a suspicion of guilt on a third party, was too weak to warrant their admission at trial.

To the extent that the trial court failed to state the reasons for its decision, the Court is not aware of any Supreme Court decision holding that the Constitution requires a trial court to state its

reasons for excluding evidence.  Consequently, the first part of Ground I of the petition is without merit.

## B. *Brady* violation

When Petitioner initially brought this action, he raised the due process claim discussed in the previous section.  Petitioner also sought discovery to determine whether the prosecution withheld any pertinent evidence from Petitioner regarding its investigation of the Lintemuth murder.  The Court granted Petitioner's request for discovery, and Petitioner subsequently received a laboratory report dated March 15, 1989, which indicated that the Mecosta County prosecutor had sent Petitioner's fingerprints to be examined to determine whether or not they matched fingerprints discovered at the scene of the Lintemuth homicide.  (*See* Dep't of State Police Laboratory Rep., ECF No. 44-1.)  The report shows that the prints discovered in that investigation did not match Petitioner's.  (*Id.*)  Although Petitioner's trial attorney specifically requested all "inculpatory and exculpatory evidence known to the Prosecution," including "crime lab reports" and other relevant information (ECF No. 44-2), the fingerprint analysis apparently was not disclosed by the prosecution.  After receiving this new evidence, Petitioner sought leave to amend the petition to add a claim that the prosecution improperly withheld exculpatory evidence.  This Court granted Petitioner's motion and stayed the action to allow Petitioner exhaust this new claim in state court.

The trial court heard Petitioner's *Brady* claim when he raised it in a motion for relief from judgment under Rule 6.508(D) of the Michigan Court Rules.  The court determined that the Michigan Court of Appeals should not have considered the issue of third-party guilt because it was not properly preserved for appeal:

> [T]here is nothing in the record to suggest that trial counsel ever made a request for the admission of the 1980 Lintemuth homicide, including the police profiles comparing the similarities of the 1980 Lintemuth murder with the 1989 Pine homicide . . . .  While it is true that the trial court did make a ruling on the issue of whether the Lintemuth homicide could be used as evidence by Defendant, this matter was presented by the People as a motion to exclude.  There is no record of Defendant

ever objecting to this exclusion, nor is there any record of Defendant seeking to admit the two police profiles at issue in this case at the trial level, despite the fact he possessed the reports at the time. The first time Defendant has mentioned or appears to have attempted to utilize the police profiles was when he attached them to his appellate brief. Consequently, the People argue that Defendant did not properly preserve this issue for review on Appeal. This Court agrees.

(5/11/2011 Op. & Ord.3-4 (footnote omitted), ECF No. 71.)

Even assuming that the issue had been preserved for appeal, the trial court determined that

Petitioner's claim was without merit:

Under *Brady*, the government has a duty in a criminal case to disclose evidence that is both favorable to the defense and material to a defendant's guilt or punishment. *Stickler v. Greene*, 527 US 263, 280 (1999). The crux of Defendant's *Brady* claim is that the People did not turn over evidence that Defendant's fingerprints did not match fingerprints left at the Lintemuth homicide scene. The significance of this information flows directly from the conclusion that a single killer was responsible for the murders of both Mary Pine and Stella Lintemuth. However . . . [a]s stated by the Court of Appeals in denying Defendant's direct appeal in 2007, "there was not enough direct evidence that another person committed the murder to find that the trial court abused its discretion in excluding the evidence." *Bailey*, 2007 WL 2141362 at *8.

The addition of evidence showing that Defendant's prints did not match those left at the Lintemuth crime scene does not in any way strengthen Defendant's claim regarding third party guilt. It was after the Mary Pine trial that the set of fingerprints was shown to belong to Scott Graham. The fact that Defendant's fingerprints did not match a particular set of prints left at the Lintemuth scene is not material to Defendant's guilt or innocence because this does not show any direct evidence that a third party committed the murder in this case. Indeed, the only relevance of the conviction of Scott Graham for the Lintemuth murder and evidence showing that Defendant's prints did not match those left at the Lintemuth crime scene is directly related to the two police profiles. This additional evidence does nothing to affect the Court of Appeals holding that the police profiles or perceived similarities between the Lintemuth and Pine murders was not enough to bring evidence of third party guilt before the jury. It was not and is not because it continues to be the case that the set of fingerprints added to the other evidence creates no more than a 'mere suspicion, a conjectural inference, excessive remoteness, or an inadequate connection' to support a claim that a third party was responsible for the murder of Mary Pine. *Id.* . . .

Finally, it is alleged that the Prosecutor violated its obligation under *Brady*.

> Upon review of the record generally, it is mere speculation to allege that such a violation occurred. There has been no claim that trial counsel was ineffective for choosing not to pursue the admission of facts about the Lintemuth homicide. This Court finds the record does not support Defendant's *Brady* claim. Consequently, even if this Court held that the issue of third party guilt was preserved and that the police profiles were part of the record on appeal, Defendant's 6.500 Motion should be denied because his alleged *Brady* violation is without merit based upon a lack of relevance, no impact on an otherwise speculative connection, and mere speculation that *Brady* was in some manner violated.

(*Id.* at 4-5.)

This decision is not contrary to, nor an unreasonable application of, Supreme Court precedent. Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 281 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469-70 (2009). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

As the state court indicated, Petitioner has not demonstrated prejudice. The evidence that Petitioner's fingerprints did not match the prints found at the scene of another, similar crime would have added nothing of substance to Petitioner's case. The police profiles were the strongest evidence of a connection between the Lintemuth murder and the murder of Ms. Pine, but the state

court reasonably concluded that this evidence should be excluded because it merely cast a suspicion of guilt upon a third party. The fingerprint evidence would have provided more support for Petitioner's already well-founded theory that he did not commit the Lintemuth murder, but it would not have cast any additional suspicion on another person for the murder of Ms. Pine. Thus, the state court reasonably concluded that failure to disclose the fingerprint evidence did not prejudice Petitioner because that evidence would have been excluded for the same reason that the police profiles were excluded. Consequently, Petitioner's claim is without merit.

## II. Ineffective Assistance of Counsel

Next, Petitioner asserts several claims of ineffective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was

- 28 -

outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010)). Because the standards under both *Strickland* and § 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). In those circumstances, "[t]he question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### (1) Prejudicial and improper testimony by footprint experts

Petitioner claims that Detectives Miller and Pratt were permitted to testify as experts in the field of footprint evidence without being qualified as such, in violation of Rules 702 and 703 of the Michigan Rules of Evidence, and that his counsel failed to make a timely objection to their testimony. At trial, Detective Miller testified that he became familiar with the tread pattern and gait of the tracks around the victim's home, and he believed they were similar to those found near Ms. Pine's vehicle at the gravel pit, those leading from Corner Market to Ms. Pine's home, and those leading in the direction of Petitioner's home. Petitioner's counsel did not object to Miller's testimony until Miller was asked whether Petitioner's shoes could have made the impressions at Ms. Pine's home. The trial court explained to the jury that Miller was not testifying as an expert; rather, his testimony was based on his own observations. Miller subsequently testified that he found similar tracks in the days immediately following the murder, and offered his opinion that the murderer had

returned to the crime scene to see what the police were doing.

Detective Pratt testified that he saw the tracks outside the victim's house on the day of the murder and went to Petitioner's house later that evening, where he saw a partial print that appeared to contain the same pattern.  He also saw footprints at the gravel pit, near the victim's vehicle, and believed that they were similar to the ones by her house. Petitioner claims that his counsel should have objected on the basis that Miller and Pratt's testimony lacked foundation and they were not qualified as experts in footprint evidence.

The state court rejected Petitioner's claim on direct appeal:

We first conclude that defense counsel was not ineffective with respect to his handling of police officer testimony relating to the tracking of suspect footprints. Detective Richard Miller testified that, after arriving at the victim's house on the evening of February 15, 1989, and during the daylight hours on February 16, 1989, he examined the imprints made by the suspect's footwear, he became familiar with the pattern on the bottom of the suspect's footwear, and, while attempting to trace the route the suspect walked as well as locate other tracks similar to the suspect's, he carried a scaled photograph of the suspect's footprint. Miller recalled that on February 16, 1989, he went to the gravel pit where the victim's car was concealed, and that the footprints he saw going from the car "seemed to correspond to the foot tracks that we tracked outside of [the victim's] house . . . ." Miller also described that on February 17 or 18, 1989, he saw outside an Oak Street apartment tracks that looked larger than the suspect's footprints but had "tread wear [that] appeared quite similar." Because Miller hoped to learn what type of footwear made the impressions, he spoke with college student Douglas Chapman and examined his Nike tennis shoes, which had "a cut or mark on the heel of the shoe, which was totally different than the track we had associated with the homicide scene," and they were larger than the suspect's shoes.

To the extent that defense counsel did not timely object to Miller's testimony that the suspect's footprint trail to the victim's house seemed similar to the footprints found at the gravel pit and that Chapman's footprints appeared larger than the suspect's, any objection was futile. *People v Mack*, 265 Mich App 122, 130; 695 NW2d 342 (2005). Because Miller explained on the record that he premised his opinions on his own perceptions of the suspect's footprints, a photograph of the suspect's footprints, and an inspection of Chapman's shoes, and because his opinions were "helpful to a clear understanding of his testimony" regarding the course of his investigation, the trial court properly admitted Miller's testimony under MRE 701.

See *Co-Jo, Inc v Strand*, 226 Mich App 108, 117; 572 NW2d 251 (1997) (fireman's testimony and observations regarding the speed and intensity of a fire were properly admitted under MRE 701 without necessity of expert qualifications where testimony was general in nature without reference to technical comparisons or scientific analysis).

Defense counsel lodged no objection to Detective George Pratt's similar testimony that he observed the suspect's footprints outside the victim's house on February 16, 1989, that he familiarized himself with the footprints, that outside defendant's address in the early morning hours of February 16, 1989, Pratt found "an impression in ice that appeared to contain the same pattern as the shoe print that I saw . . . behind [the victim's] home," and that he later observed near the victim's abandoned car "footwear impressions . . . similar to the impressions that [he] saw behind Mary Pine's home and also the type that appeared" outside defendant's address. But because Pratt likewise explained that he had based his opinions regarding footprint similarity on his own perceptions, his testimony also qualifies as admissible pursuant to MRE 701, and any objection would have been meritless.

(MCOA Op. 7.)

The state court found that counsel's conduct was not unreasonable and that Petitioner failed to demonstrate prejudice because Miller and Pratt's testimony was properly admitted under MRE 701. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Moreover, the Court discerns no error in the admission of Miller and Pratt's opinions because they were based on their personal observations. If an objection would have been meritless under state law, then Petitioner cannot claim that his attorney was ineffective. Consequently, Petitioner's claim is without merit.

### (2) Failure to call expert witnesses

Petitioner asserts that his attorney provided ineffective assistance when he decided not to call two expert witnesses who would have offered testimony to rebut the testimony of the government's expert witness. One of Petitioner's experts, Dr. E.C. Frederick of Exeter Research Inc., compared Petitioner's Nike Air Pegasus Size 10D running shoes to photographs of shoe prints (ostensibly, the

shoe prints found outside Ms. Pine's home).  (App'x N to Br. in Supp. of Pet., ECF No. 2-15.)  Dr.

Frederick's report notes that "[t]he shoe prints were most probably made by a size 10 Nike Air

Pegasus," but that Frederick "did not find any evidence that would exclude the specific shoes

provided from the source of the impressions."  (*Id.*)  In addition, he "did not find evidence that

would allow [him] to conclude that there is a high probability that the specific shoes in question

made the impressions in the photograph."  (*Id.*)   In short, Dr. Frederick's findings are

"inconclusive." (*Id.*)  Similarly, according to an FBI report, casts of "footwear impressions"

submitted to that agency "correspond in size, design, and limited general wear characteristics" with

Petitioner's shoes, but "[d]ue to lack of identifying characteristics . . . a definite conclusion could

not be reached whether the . . . impressions were or were not made" by those shoes.  (FBI Report,

App'x P to Br. in Supp. of Am. Pet., ECF No. 61-1.)

> On appeal, the state court rejected Petitioner's claim for the following reasons:
>
> [O]ur review of the trial transcripts reflects that defendant affirmatively expressed his concurrence in the prosecutor's and defense counsel's agreement to admit footwear analysis reports by E. H. Frederick, Ph.D., and the FBI, in lieu of calling Frederick and the FBI author as witnesses; defendant's agreement arguably waived and extinguished any claim of error. *People v Carter*, 462 Mich 206, 214-216; 612 NW2d 144 (2000). Regardless, decisions regarding what witnesses and evidence to present at trial involve matters of trial strategy, which this Court generally will not second-guess, and defense counsel's decision to introduce the reports of Frederick and the FBI, and to cross-examine prosecution footwear expert Gary Truszkowski regarding the basis for his opinions concerning the conclusions of these reports, falls within the range of reasonable trial strategy. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).[5]
>
> > n.5 Defense counsel elicited Truszkowski's concession that neither he, Frederick, nor the FBI author could "identify [defendant's] particular shoes as what made the impressions."

(MCOA Op. 7-8.)

> The state court's determination was not contrary to, nor an unreasonable application of,

clearly established law.  Even if Petitioner could show that his counsel's conduct was unreasonable, he was not prejudiced by his counsel's decision.  The court allowed the jury to review defense expert's reports.  In addition, Petitioner's counsel elicited testimony from the government's expert that his conclusion was consistent with those of Petitioner's experts.  Truszkowski agreed that the footwear impression was not clear enough to make a positive match with Petitioner's shoes. Judging from the experts' reports, their testimony would have added nothing of significance to Petitioner's defense.  Indeed, their testimony could have harmed Petitioner's case by calling attention to their conclusions that footprints at the scene of Ms. Pine's death corresponded to a shoe of the same size and type as Petitioner's.  It is not difficult to discern a valid, strategic reason for declining to call these experts as witnesses, or to conclude that Petitioner was not prejudiced by their absence at trial.

Petitioner argues that prejudice should be presumed because his counsel was effectively absent at a critical stage of the proceedings when he failed to object to Miller and Pratt's testimony, and in failing to rebut the government's case with meaningful, adversarial testimony from his own witnesses, citing *United States v. Cronic*, 446 U.S. 648 (1984).  In *Cronic*, the Court noted that the presumption of prejudice applies if counsel is denied "at a critical stage of his trial" or "entirely fails to subject the prosecution's case to meaningful adversarial testing[.]"  *Id.* at 659.

*Cronic* is distinguishable, and the presumption of prejudice does not apply.  Petitioner's counsel was not absent from the proceedings, and given that he effectively cross-examined the prosecution's expert, it cannot be said that counsel entirely failed to subject the prosecution's case to meaningful adversarial testing.  Petitioner identifies no Supreme Court case in which prejudice has been presumed where defense counsel is present during the proceedings but offers expert reports

in lieu of expert testimony, and proceeds to elicit a favorable concession during cross-examination of the government's expert witness.  Thus, Petitioner's claim should be denied on the merits.

### (3) Failure to request instruction for dog tracking evidence.

Petitioner claims that the government presented dog-tracking evidence, and that counsel was ineffective for failing to request the standard instruction for such evidence.  The state court held:

> [D]efense counsel was not ineffective on the basis that he failed to request the cautionary dog tracking instruction, CJI2d 4.14. Two former state police dog handlers testified that they brought tracking dogs to the scene of the victim's murder on the evening of February 15, 1989; that their dogs were incapable of backtracking the suspect's footprints from the alley behind the victim's house toward their origin; that the dogs detected no track leading away from the victim's house, only a scent from the small distance between the victim's house, which had been contaminated with the scents of multiple officers, to an area near the front of the victim's garage; and that therefore, shortly after arriving, they put the dogs away. Because the evidence did not support a request by defense counsel for the cautionary instruction regarding dog tracking, counsel was not ineffective for failing to urge the trial court to read CJI2d 4.14. *Mack*, supra at 130.

(MCOA Op. 8.)

Petitioner does not identify any error in the state court's assessment of the evidence presented.  In short, no instruction was necessary because no evidence of dog tracking was presented to implicate Petitioner in the charged offenses.  Although Petitioner claims that an instruction was necessary, he does not identify the evidence which would have required one.  Review of the state court record confirms that the dog handlers were not able to find any tracks using their dogs, and relied on their own observations to follow the tracks leading to Ms. Pine's home.  Thus, Petitioner has not identified objectively unreasonable conduct by his counsel or prejudice resulting from such conduct.

### III.  Admission of Other Acts Evidence

Petitioner asserts that he was denied due process when the trial court admitted evidence that Petitioner was involved in several burglaries prior to his entry into Ms. Pine's home, including the burglary of Mike's Market and the homes of Brian Kelly and Robert King.  In a pre-trial notice filed with the court, the prosecutor indicated that it intended to offer this evidence under Rule 404(b)(1) of the Michigan Rules of Evidence to show Petitioner's "pattern or scheme ('MO')" in committing burglaries. (App'x C to Br. in Supp. of Pet., ECF No. 2-4.).  During the prosecutor's opening and closing statements, he argued that these burglaries were evidence of a "modus operandi" or "pattern of criminal behavior" consistent with the offense against Ms. Pine.  (*See* Tr. II at 2-6; Tr. VIII at 4.)  Petitioner contends that the prosecutor's statements show that the evidence was admitted to prove identity rather than pattern or scheme, because evidence of a "modus operandi" is typically used to show the identity of the perpetrator.  *See People v. Ho*, 585 N.W.2d 357, 362 (Mich. Ct. App. 1998).  In its instructions to the jury, the trial court stated:

> . . . You have heard evidence that the defendant was involved in burglary crimes for which he is not on trial.  If you believe this evidence you must be careful only to consider it for certain purposes.
>
> You may only think about whether this evidence tends to show, one, that the defendant used a plan, system, or characteristic scheme, modus operandi, he has used before or since; and/or, two, who committed – who committed the crime that the defendant is charged with.
>
> You must not consider this evidence for . . . any other purpose.  For example, you must not decide that it shows that the defendant is a bad person or that he is likely to commit crimes.  You must not convict the defendant here because you think he is guilty of other bad conduct.  All the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crime . . . .

(Tr. VIII at 107-08.)   Thus, Petitioner also contends that the trial court should have instructed the jury of the specific purpose for which it could consider the evidence (i.e., plan, scheme, or system;

not identity).

On appeal, the state court held that the evidence was properly admitted under Rule 404(b) of the Michigan Rules of Evidence to show a "scheme, plan or system" of committing burglaries, and that its probative value outweighed any danger of unfair prejudice. (MCOA Op. 4-5.) Moreover, the prosecutor's statements, even if they mischaracterized the evidence, did not affect the outcome of the proceedings because it was "unlikely that the jury made any distinction between the prosecutor's reference to scheme, plan, or system relative to the burglaries and the reference to modus operandi relative to the burglaries"; in addition, the prosecutor's comments were mitigated by the trial court's instruction that the statements and arguments of the attorneys are not evidence. (*Id.* at 2 & n.1.)

The state court's decision regarding the admissibility of this evidence concerns an issue of state law which is not reviewable in these proceedings. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988). Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant federal habeas relief. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). "[S]tate-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). Petitioner cannot make such a showing. The Supreme Court has declined to hold that the admission of "others-acts" evidence is so extremely unfair that it violates fundamental conceptions of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990) (finding that the presentation of evidence of another robbery for which the defendant had previously been tried and acquitted did not violate fundamental

- 36 -

conceptions of justice).  Such matters are more appropriately addressed in codes of evidence and procedure than under the Due Process Clause.  *Id.* at 352.  In other words, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh*, 329 F.3d at 512.

To the extent Petitioner contends that the state court should have informed the jury of the specific basis for admission of this evidence, he fails to cite any state court precedent in support of his argument.  Nor does he cite any Supreme Court precedent indicating that a failure to provide such an instruction is a violation of due process.  Indeed, if it is not clearly established that the admission of evidence of other bad acts violates due process, then it cannot be clearly established that a state court must instruct the jury to consider such evidence only for the specific purpose for which it was admitted.  Consequently, the state court's decision was not contrary to clearly established law.

### IV.  Witness Statement

Petitioner contends that he was deprived of the right to present a complete defense when the trial court determined that he could not admit the statement of a deceased witness, Weston Wood. Wood was a neighbor of Ms. Pine.  The day after the murder, he told the police that she had delivered a newspaper to his home at 2:00 pm the previous day, but then changed his story and stated that she delivered the paper shortly after 3:00 pm.  (App'x I to Br. in Supp. of Pet., ECF No. 59-4.)  In at least three subsequent interactions with the police occurring on February 16, February 24, and March 3, 1989,  Wood reiterated that Ms. Pine delivered the newspaper at 3:10 pm., which would have been during the time that Petitioner was at work.  (App'x E-G to Br. in Supp. of Pet., ECF Nos. 58-5, 59-1, 59-2.)  In 1990, however, Wood told the police that Ms. Pine left the

- 37 -

newspaper at his home at 2:00 pm, and that if he told the police a later time in previous interviews, that time was incorrect.

Petitioner's counsel sought to have the police reports admitted under Rule 803(24) of the Michigan Rules of Evidence, which provides that a statement not otherwise covered by another hearsay exception may be admitted if, among other things, it has "equivalent circumstantial guarantees of trustworthiness." Mich. R. Evid. 803(24). The trial court determined that, given the inconsistencies in Wood's statements, the police reports were not sufficiently credible to be admitted. (6/9/2005 Mot. Hr'g Tr. 9-10, ECF No. 10.) Petitioner's counsel raised the issue again in a motion for reconsideration, and the trial court denied the motion. (Tr. II at 5-21.) On appeal, the Michigan Court of Appeals affirmed the trial court's decisions, noting that the inconsistencies in Wood's statements called into question their trustworthiness. (MCOA Op. 6.) In addition, Petitioner failed to show that he was prejudiced by the exclusion of this evidence in light of Wood's conflicting version of the events and the fact that Wood's "final say on the matter" was not helpful for Petitioner. (*Id.*)

As I have already stated, it is not the province of this Court to evaluate the validity of the state court's evidentiary rulings under state law. *See Estelle*, 502 U.S. at 67-68. Petitioner claims that he was denied a right to present a defense, but that right is limited by reasonable restrictions in the state's evidentiary rules. *Scheffer*, 523 U.S. at 308. "Only if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness [does] it . . . violate due process and thus warrant habeas relief." *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004) (internal quotation marks omitted). The state court's ruling was not egregious in this case. Given that Wood's statements were contradictory, and that his first and final statements were not helpful for Petitioner's case, the

state court reasonably determined that Wood's statements were properly excluded as untrustworthy and that Petitioner was not prejudiced by their exclusion.

### V. Closing Arguments

Finally, Petitioner claims that he was denied the right to the effective assistance of counsel and the right to present a defense when the trial court limited the content of his counsel's closing argument, prohibiting him from discussing evidence that Petitioner is not prone to violence. Respondent argues that this claim is procedurally defaulted. The court of appeals addressed this claim as follows:

> . . . Because defendant did not object to the trial court's ruling limiting closing argument, we consider this issue only to determine whether a plain error occurred that affected defendant's substantial rights. *Carines*, *supra* at 763-764.
>
> When the prosecutor proposed a rebuttal character witness, the trial court correctly observed that defendant had injected the issue of his propensity for peaceful behavior, thus opening the door to evidence of his propensity for violence. Defense counsel had questioned the Kellys, King, and Michael Monica, defendant's burglary accomplice, regarding whether defendant ever had exhibited any aggressive, angry, or violent behavior, including when confronted with allegations of burglary. Nonetheless, the trial court, apparently referring to MRE 403, precluded the prosecutor from presenting rebuttal character testimony regarding a 1991 or 1992 sexual assault by defendant, which the trial court viewed as more prejudicial than probative. The trial court explained that, rather than permit the defense to emphasize inaccurate character evidence, it deemed it fair to impose the narrow prohibition on the defense that it could not mention during closing argument that defendant never had behaved aggressively toward his prior victims.
>
> Because the trial court has broad discretion to control trial proceedings, and because the trial court weighed competing considerations of fairness, specifically defendant's interest in precluding relevant but unfairly prejudicial rebuttal evidence and the prosecutor's interest in undercutting the inaccurate character testimony elicited by defendant, we conclude that the trial court did not abuse its discretion when it imposed the closing argument restriction. *Taylor*, *supra* at 522.
>
> Even assuming that the limitation constitutes plain error, it did not affect the outcome of defendant's trial because the jury already had heard four witnesses testify concerning defendant's nonconfrontational behavior, defense counsel successfully

addressed during his closing argument that defendant's "MO" involved robbing places when he "was certain nobody would be home" and that he took only "[p]op cans and minor change," defense counsel otherwise argued at length in attacking the prosecutor's evidence, and because substantial properly admitted evidence reasonably supported the jury's finding that defendant killed the victim. *Carines*, *supra* at 763-764.

(MCOA Op. 9-10.)

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim (in this case, the decision by the Michigan Court of Appeals on Petitioner's direct appeal). *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

First, Michigan has a contemporaneous objection rule. *See People v. Schutte*, 240 613 N.W.2d 370, 377 (Mich. Ct. App. 2000) ("Appellate review of allegedly improper conduct by the prosecutor is precluded where the defendant fails to timely and specifically object; this Court will only review the defendant's claim for plain error."). The rule applies in this case and it was enforced by the state court. The Michigan Court of Appeals found that Petitioner did not comply with this rule and that no plain error occurred.  *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) ("Controlling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules.").   In addition, the failure to object was an "adequate and independent" ground on which to foreclose review of Petitioner's claim.  *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010).

When a petitioner has procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner does not argue cause to excuse his procedural default.  Moreover, as indicated by the state court, he has not shown prejudice.  Even though his counsel was not permitted to offer

argument regarding Petitioner's non-violent history, the jury had already heard evidence of that history.   Brian Kelly, Laurie Kelly, and Robert King each testified that Petitioner did not show hostility when confronted with accusations that he had broken into their homes.   In addition, Petitioner's friend, Michael Monica, testified that he never observed any violent tendencies in Petitioner.   Highlighting this testimony during closing arguments would not have had a significant effect on the outcome of the trial.

Finally, Petitioner does not present new evidence of innocence that would entitle him to the miscarriage-of-justice exception.   Consequently, Ground V of the petition should be denied because it is procedurally barred.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied on the basis that Grounds I through IV are meritless and Ground V is procedurally barred.

Should the Court deny the petition, it must determine whether a certificate of appealability should be granted.  28 U.S.C. § 2253(c)(2).   A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).   The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).   Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.   Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.

Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional

claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.* When a habeas petition is denied on procedural grounds, a certificate of appealability may issue only "when the prisoner shows, at least, [1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Both showings must be made to warrant the grant of a certificate. *Slack*, 529 U.S. at 484.

Examining Petitioner's claims under the standard in *Slack*, reasonable jurists would not conclude that this Court's dismissal of Petitioner's claims in Grounds I to IV on the merits, or its dismissal of Ground V because it is procedurally defaulted, to be debatable or wrong. Accordingly, I recommend that the Court deny Petitioner a certificate of appealability.

Date:  November 19, 2015                          /s/ Phillip J. Green
                                                  PHILLIP J. GREEN
                                                  United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).