UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK DAVID BAILEY #201511,           )
        Plaintiff,           )
                                        )          No. 1:09-cv-460
-v-                                                    )
                                        )          HONORABLE PAUL L. MALONEY
BLAINE C. LAFLER                                )
        Respondent.           )
_____)

## OPINION

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 271–82 (1999) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

As framed by the State, this case presents questions that ordinarily have easy answers in a *Brady* analysis.

Can evidence excluding a defendant from "Murder 1" be "exculpatory" in a trial for an unrelated "Murder 2"? Likewise, can "prejudice ensue" when the State suppresses exculpatory evidence from "Murder 1" in a trial for "Murder 2"?

The answer to both questions is ordinarily "no," as evidence from one crime is rarely relevant to another crime.

But the facts in this case are far from ordinary.

In this case, an FBI profile report linked "Murder 1" with "Murder 2" early on; and the report concluded that one suspect was likely responsible for both murders because the "signatures" left at each crime scene (both in a rural West Michigan town) were eerily similar.

Nearly two decades after the profile report was prepared, Petitioner Mark David Bailey was charged for "Murder 2." Mr. Bailey sought to introduce the profile report, along with the fact that he was ten-years-old at the time of "Murder 1," as evidence which would, in his view, cast a reasonable doubt as to his own responsibility for "Murder 2."

The trial court excluded the report and all references to the earlier murder—without any legal analysis or explanation—and the issue was preserved for appeal.

On appeal, the State argued that the profile report actually *supported* a conclusion that Mr. Bailey, despite his age, committed "Murder 1."

The Michigan Court of Appeals, while acknowledging Mr. Bailey's right to introduce evidence of third-party guilt and conceding the issue on appeal was "arguable," ultimately concluded that the profile report amounted to "mere suspicion" or a "conjectural inference," and the trial court did not abuse its discretion by excluding the evidence.

Troublingly, unbeknownst to Mr. Bailey, his lawyer, and all state judges who grappled with the evidentiary issues to that point, the State, while investigating Mr. Bailey for "Murder 2," had requested and received a fingerprint analysis of latent prints found at the scene of "Murder 1" that *excluded* Mr. Bailey as a suspect in "Murder 1"—even though the State knew he was only ten at the time of that crime. (And again, the State nonetheless argued on appeal that the profile report *supported* Mr. Bailey's responsibility for "Murder 1," despite his age.)

As framed by the facts, the *Brady* questions in this case, therefore, are much more precise than those the State contends are presented.

Was the evidence that excluded Mr. Bailey as a suspect in "Murder 1" "exculpatory" for Mr. Bailey's trial for "Murder 2"—when the State's own evidence (partially disclosed and partially suppressed) together suggested that a suspect other than Mr. Bailey likely committed "Murder 2"? Likewise, did "prejudice ensue" when the State suppressed the exculpatory evidence from "Murder 1" prior to Bailey's trial for "Murder 2"—when the effect of the suppression was to partially blind the state judges' analysis of important evidentiary questions and ultimately violate Bailey's right to present a complete defense by introducing probative evidence of third-party guilt?

The answer to both questions is "yes"; Mr. Bailey, therefore, is entitled to a new trial.

## I.   STATEMENT OF FACTS & PROCEDURAL HISTORY

Plaintiff Mark David Bailey, a prisoner under the control of the Michigan Department of Corrections, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Magistrate Judge Philip J. Green issued a report and recommendation recommending that Petitioner's claims in Grounds I to IV be denied on the merits and claim under Ground V be dismissed as procedurally defaulted.

The facts themselves are beyond genuine dispute, as reported by the Magistrate Judge. Accordingly, the Court **ADOPTS** the Magistrate Judge's summary facts contained in his report, with the exception of a few omitted facts and his characterization of certain facts that lead to erroneous legal conclusions. (*See* ECF No. 83 at PageID.946–60.) The Court will highlight and add relevant facts as it sees fit throughout this opinion.

To begin, however, establishing a timeline of this case is helpful.

A.   April 1980: 89-year-old Stella Lintemuth is murdered in Big Rapids. The murder would go unsolved for decades.

B.   February 1989: 79-year-old Mary Pine is murdered in Big Rapids. There are marked similarities between this murder and the earlier, unsolved murder in 1980. Mark David Bailey is a suspect early on.

C.   March 15, 1989: After the investigators send Bailey's fingerprints for examination to determine whether they matched fingerprints left at the scene at the Lintemuth homicide, the Michigan State Police submits a laboratory report showing the latent prints from the Lintemuth homicide did not belong to Bailey. This information is suppressed from Bailey.

D.   April 1989–May 1990: Two profiles are completed in response to a request by the Big Rapids Police Department and the Department of State Police.

E.   April 4, 1989: State Police report remarks on the noticeable similarities of the two murders, and surmises that both were committed by the same suspect.

F.   May 31, 1990: The FBI Academy at Quantico issues a detailed report in response to the Big Rapids Police Department. The expert report concludes "that one offender is most likely responsible for both crimes."

G.   June 2005: Bailey is charged with murder for the Pine homicide, and the matter proceeds to trial.

H.   June 9, 2005: In the context of addressing evidentiary disputes, Judge Matuzak concludes: "And, also, regarding another murder of an elderly person when the defendant would have been about 10 years old, that is not to be brought before the jury." No legal explanation is given for the exclusion.

I.   June 23, 2005: Judge Hill-Kennedy memorializes the previous oral ruling : "IT IS HEREBY ORDERED the People's motion to exclude the defense from offering evidence of other homicides is GRANTED."

J.   July 29, 2005: Bailey is convicted of first-degree premeditated murder, MCL 750.316(1)(a), and first-degree felony murder, MCL 750.316(1)(b), arising from the February 1989 killing of 79-year-old Big Rapids resident Mary Pine. The Trial Court sentenced Bailey to life imprisonment without parole for one count of first-degree murder. The trial court excluded evidence pertaining to the earlier 1980 murder of Stella Lintemuth, despite the fact that profile reports concluded that the same perpetrator was likely responsible for both crimes. Bailey would have been ten-years-old at the time of the 1980 murder.

K.   June 2007: Mecosta County prosecutor initiates criminal charges against Scott Elwood Graham for the 1980 Lintemuth homicide.

4

L.   July 26, 2007: After Bailey appeals his conviction to the Michigan Court of Appeals arguing, among other things, that the trial court erred when it excluded evidence concerning the then-unsolved 1980 murder of Stella Lintemuth and the related third-party-guilt theory, the Court of Appeals rejects Bailey's claim holding that, although police profiles provided by the FBI and the Michigan State Police noted "several similarities" between the two killings, there was not enough "direct" evidence that another person committed the murder to find the trial court abused its discretion. The Court of Appeals finds that "[u]nder the circumstances presented, and considering the similarities between the crimes as well as the differences, a reasonable and principled decision would include one that finds nothing more than the creation of mere suspicion, a conjectural inference, excessive remoteness, or an inadequate connection."

M.   February 29, 2008: Bailey's application for leave to appeal to the Michigan Supreme Court is summarily denied.

N.   2008: Scott Elwood Graham is extradited to the State of Michigan to face charges for the 1980 murder of Stella Lintemuth.

O.   2009: Graham is convicted of the 1980 murder of Stella Lintemuth based largely upon fingerprints matched at the murder scene.

P.   May 19, 2009: Bailey files a Petition for Habeas Corpus under 28 U.S.C. § 2254.

Q.   April 8, 2010: Magistrate Judge Scoville grants Bailey's motion for discovery in part seeking production of the criminal file in the Graham prosecution. All evidence existing at the time of Bailey's trial in July 2005 is discoverable.

R.   August 2010: Bailey's counsel receives a fingerprint report from 1989 that had excluded Bailey from the 1980 murder.

S.   September 2010: Magistrate Judge Scoville granted Bailey's motion to amend his complaint and stay the case to add the *Brady* claim in response to the fingerprint report excluding Bailey from the earlier homicide. Judge Scoville stayed the case to allow Bailey to properly exhaust his *Brady* claim and bring the claim in state court as a 6.500 motion. Judge Scoville in his R&R concluded:

> "Petitioner has met his burden of showing a plausible *Brady* violation at the pleading stage. Given the admitted similarities in the two murders, as found by the FBI, the fingerprint evidence in the Lintemuth case was arguably favorable to petitioner. The state does not deny that the evidence was not produced to the defense at the time of trial. And it is at least arguable that the

exculpatory fingerprint evidence, in conjunction with the FBI and State reports, would have induced a reasonable doubt in the mind of at least one juror. Therefore, amending the petition to assert a *Brady* claim cannot be deemed futile."

(ECF No. 49 at PageID.409.)

T.   May 11, 2011: Judge Hill-Kennedy issues an order denying Bailey's motion for relief from judgment. He concludes:

"Upon review of the record generally, it is mere speculation to allege that such a violation occurred. There has been no claim that trial counsel for Defendant was ineffective for choosing not to pursue the admission of facts about the Lintemuth homicide. This Court finds the record does not support Defendant's *Brady* claim. Consequently, even if this Court held that the issue of third party guilt was preserved and that the police profiles were part of the record on appeal, Defendant's 6.500 Motion should be denied because his alleged *Brady* violation is without merit based upon a lack of relevance, no impact on an otherwise speculative connection, and mere speculation that *Brady* was in some manner violated."

(ECF No. 64-2 at PageID.846.)

U.   July 2013: Magistrate Judge Scoville grants Bailey's motion to reopen the case.

V.   September 2013: Bailey files an amended petition including the *Brady* claim. The claim clearly "related back" to the original petition.

W.   November 2015: Magistrate Judge Green issues a Report and Recommendation, concluding that all of Bailey's claims for relief should fail and a certificate of appealability should not issue in any respect.

X.   December 2015: Bailey files objections to the Report and Recommendation.

Next, the Court wishes to provide context to this opinion going forward by fleshing out the similarities between the 1980 and 1989 homicides, as described by the FBI.

On May 31, 1990, an "FBI crime analysis" was prepared at Quantico. (ECF No. 61-3 at PageID.625.) A police investigative analyst, supervisory special agent, and other members of the National Center for the Analysis of Violent Crime (NCAVC) worked together on the report. (*Id.*) The conclusions were based on "knowledge drawn from the

personal investigative experience, educational background, and research conducted by the[]

crime analysts as well as other NCAVC members." (*Id.*)

First, the report analyzed the victimology, generally, noting that both victims: were elderly, white females; "lived alone in a single-family home"; resided "in the same general part of Big Rapids, Michigan"—a small town; and "left the door unlocked." Neither had any known enemies. (*Id.* at PageID.625–26.) Then, the report noted the very similar natures of the medical examiner's reports, noting both victims: "suffered multiple stab wounds"; fractures, including of the skull; had an "electrical cord around" the neck or head; and had identical causes of death—"stab wounds" and "blunt trauma." (*Id.* at PageID.626.) The report then summarized all known "similarities between the two [crime] scenes that would suggest that both crimes were most likely committed by the same offender." (*Id.* at PageID.627.)

> In both cases, the victimology is very similar, as is the demographics of their residences. In each case, an electrical cord was wrapped around the neck or face of the victim, but served no apparent useful purpose insofar as cause of death is concerned. Severe blunt trauma, focused on the head area of both victims, reflects significant hostility and anger felt by the assailant. The age and circumstances of both victims indicate this anger and hostility are directed toward elderly females.

> While the time of death for Stella Lintenmuth is estimated to be in the early morning, Mary Pine was killed between 3:10 p.m. and 6:50 p.m. Both could be described as daylight offenses, thereby increasing the risk level to the offender.

> In the case of Lintenmuth, the weapon used was positioned on her body by the offender, and in the case of Mary Pine, the broken handles of two separate weapons were apparently positioned on a newspaper near the point of assault. These factors indicate that the offender had a personal need to do this, and the significance would be known only to the offender.

In both cases, the offender apparently arrived on foot, entered the residence without the need for forced entry, and utilized several weapons that were available at the scene. No ransacking of either residence was evident, and no theft of property from either victim could be established. The injuries of both victims were consistent with the offender being right-handed, and no sexual assault of either victim could be established.

The amount of violence carried out against the victims was well in excess of that required to cause death and is consistent with an offender who is feeling a high level of anger and hostility. Considering the close proximity of the two murders, as well as the disposal site of Pine's car, it is likely that both victims were known to the offender through observations or some other association. The anger displayed by the offender is likely to be displaced aggression because of his feelings about a significant female in his life or elderly women in general.

The weapons used in both offenses were weapons of opportunity obtained from the victims' homes. This indicates that the offender may not have access to or own a weapon, such as a knife or gun. Both victims were inside unlocked houses, affording the offender quick and easy access. These two aspects indicate crimes of opportunity. However, the ages and circumstances of the victims and the time of day the crimes were committed indicate that the offender knew what to expect when he entered the victims' residences.

There is no apparent theft motive displayed in either case. Items that cannot be located, however, such as two rings and a pendant belonging to Mary Pine, may have been taken by the offender. If such is, in fact, the case, the reason for taking such items would likely be related to souvenirs for his own use in re-experiencing the event, rather than for financial gain.

The absence of seminal fluid at either crime scene and no penile penetration on either victim suggest that the offender was motivated by anger, hostility, and frustration. The stabbing of the vaginal area of Mary Pine is likely a product of the same motivation.

Based on similarities of these two crimes as set out above, and when considered with the size of the community and the proximity of the crimes to each other, it is our opinion that one offender is most likely responsible for both crimes.

(*Id.* at PageID.627–28.)[1] [2]

## III.   LEGAL FRAMEWORK

With respect to dispositive motions, a magistrate judge issues a report and recommendation, rather than an order. After being served with a report and recommendation (R&R) issued by a magistrate judge, a party has fourteen days to file written objections to the proposed findings and recommendations. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). A district court judge reviews de novo the portions of the R&R to which objections have been filed. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Only those objections that are specific are entitled to a de novo review under the statute. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (per curiam) (holding the district court need not provide de novo review where the objections are frivolous, conclusive or too general because the burden is on the parties to "pinpoint those portions of the magistrate's report that the district court must specifically consider"). Failure to file an objection results in a waiver of the issue. *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005); *see also Thomas v. Arn*, 474 U.S. 140, 155 (upholding the Sixth Circuit's practice). The district judge may then accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

---

[1]     The Court will note that each of the alleged differences between the cases that the State's counsel advanced at oral argument are patently inconsistent with the report. (*See, e.g., id.* at PageID.627 ("[N]o sexual assault of either victim could be established.") ("No ransacking of either resident was evident, and no theft of property from either victim could be established."); PageID.628 ("There is no apparent theft motive displayed in either case.").)

[2]     The Court will further note that the decision of the state trial court to admit a host of prejudicial 404(b) evidence of Mr. Bailey's prior burglary convictions is at least called into question by the report, because the report concludes: "[t]here is no apparent theft motive in either case." (*Id.*)

Of course, in the AEDPA context, "[f]ederal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of this Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington v. Richter*, 562 U.S. 86, 100 (2011).

## IV.   ANALYSIS

Mr. Bailey raises three objections to the Report and Recommendation; he "maintains that conclusions as to Issues I, II, and III [or A, B, and C here] are debatable and/or wrong." (ECF No. 91 at PageID.1020.) Mr. Bailey has waived Issues IV and V. (*See id.*)

### A.    Right to Present a Complete Defense & Right to Due Process

Mr. Bailey's *Brady* and third-party guilt claims are inextricably intertwined. The claims together reveal the ultimate constitutional error: Bailey was not allowed to introduce the probative evidence that strongly suggested a person other than Bailey was "most likely responsible for both crimes[, including the Pine homicide]." (ECF No. 71.)

#### i.    *Legal Framework: Right to Present a Complete Defense & Third-Party Guilt*

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), *accord Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).

10

"This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Holmes*, 547 U.S. at 324 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

As a general rule, evidence of third-party guilt is treated the same as other evidence— it should be allowed unless "its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* However, because the ability to produce evidence of third-party guilt implicates the right "to present a complete defense[,] . . . . [t]his right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id.* at 319 (quoting *Scheffer*, 523 U.S. at 308).

In *Holmes*, the Supreme Court cited approvingly to the South Carolina Supreme Court's underlying evidentiary rules. *See id.* at 327 (citing, e.g., 41 C.J.S., Homicide § 216, pp. 56–58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by the accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded").)

However, the Supreme Court criticized the South Carolina Supreme Court because it "radically changed and extended the rule" by focusing on the "the strength of the prosecution's case" and excluding evidence of alleged statements of guilt made by a third-party. *Id.* at 328–29. Thus, the Court vacated the judgment of the state court notwithstanding that direct, forensic evidence was otherwise overwhelming.

### ii.   *Legal Framework: Right to Due Process & Brady Violations*

In *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Court has held that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Prejudice and materiality are established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 281 (quoting *Bagley*, 473 U.S. at 682); *see also Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Put another way, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289–290.

"Under the standard stated above, the reviewing court may consider directly *any adverse effect* that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case." *Bagley*, 473 U.S. at 682 (emphasis added).

### iii. Brady Violation: Analysis

Since the fingerprint analysis was indisputably withheld from Mr. Bailey and all state judges through direct appeal, this Court permitted Mr. Bailey to amend his petition to add the *Brady* claim. Mr. Bailey then had to exhaust that claim in state court by filing a motion for relief from judgment. The order denying that motion was erroneous in several respects.

### 1. The trial court's erroneous Brady analysis.

In May 2011, the state trial court issued an order denying Bailey's motion for relief from judgment, concluding in relevant part:

> Upon review of the record generally, it is mere speculation to allege that such a violation occurred. There has been no claim that trial counsel for Defendant was ineffective for choosing not to pursue the admission of facts about the Lintemuth homicide. This Court finds the record does not support Defendant's *Brady* claim. Consequently, even if this Court held that the issue of third party guilt was preserved and that the police profiles were part of the record on appeal, Defendant's 6.500 Motion should be denied because his alleged *Brady* violation is without merit based upon a lack of relevance, no impact on an otherwise speculative connection, and mere speculation that *Brady* was in some manner violated.

(ECF No. 64-2 at PageID.846.)

Respectfully, the state trial court's decision is "based on an unreasonable determination of the facts" in light of the record *and* "contrary to" clearly established federal law, *see Strickler*, 527 U.S. at 281 (quoting *Bagley*, 473 U.S. at 682); *see also Cone v. Bell*,

129 S. Ct. 1769, 1783 (2009). The trial court's opinion denying the motion for relief from judgment suffers from several legal and logical defects.

First, the state trial court erroneously concluded that "[t]he issue of the admissibility of evidence of third party guilt was not preserved for [direct] appeal," even though the Court of Appeals fully considered and ruled on the merits of Mr. Bailey's appeal with respect to that very issue. It is axiomatic that when confronted with a post-judgment motion, a trial court cannot rewrite the previous appellate record. Surprisingly, the trial court held Mr. Bailey "waived" an issue after the appeals court had ruled on the merits of that issue—but then the trial court nonetheless rested on the appeal court's merits conclusion that Mr. Bailey had lost on that derivative issue as the basis for denying his *Brady* claim.

In reality, the State never argued that the "third-party guilt" issue was not preserved on direct appeal; accordingly, any reasonable jurist would have found the State's waiver argument was waived on a motion for relief from judgment. *See, e.g., Fagan v. Washington*, 942 F.2d 1155, 1157 (7th Cir. 1991) (collecting cases) ("They have, as so often before, waived waiver."); *People v. McGraw*, 771 N.W.2d 655, 661 n.36 (Mich. 2009) ("Because the prosecution failed to raise the issue of defendant's waiver, we need not consider it.").[3]

Second, the state trial court did not perform a proper *Brady* analysis; to the extent it finally arrived at a legal framework, the state trial court noted:

---

[3]     The State also filed a motion for sanctions in state court in response to the motion for relief from judgment, arguing that Defense counsel "created and contrived the record on appeal" and "somehow duped the Michigan Attorney General's Office, the Court of Appeals, and now a Federal District Court." In one of its briefs, the State argued: "[C]ounsel suggests because no court or prosecutor ever caught Ms. Niewenhuis' slight of hand on the third party guilt preservation issue, it is too late to now fix this attempted injustice." (ECF No. 63-5 at PageID.799.) In other words, the State argued the waiver doctrine should apply to Mr. Bailey on a post-judgment motion but not the State on direct appeal. This argument was patently frivolous, and the state trial court inexplicably bought it.

Under *Brady*, the government has a duty in a criminal case to disclose evidence that is both favorable to the defense and material to a defendant's guilt or punishment. *Stickler* [sic] *v. Greene*, 527 US 263, 280 (1999). The crux of Defendant's *Brady* claim is that the People did not turn over evidence that Defendant's fingerprints did not match fingerprints left at the Lintemuth homicide scene. The significance of this information flows directly from the conclusion that a single killer was responsible for the murders of both Mary Pine and Stella Lintemuth. However, it is for this reason that Defendant's 6.500 Motion raising a *Brady* violation should be denied. As stated by the Court of Appeals in denying Defendant's direct appeal in 2007, "there was not enough direct evidence that another person committed the murder to find that the trial court abused its discretion in excluding the evidence." *Bailey*, 2007 WL 2141362 at *8.

(ECF No. 64-2 at PageID.850.)

In other words, from the outset, the state trial court skipped over the *Brady* analysis—the effect of the fingerprints on "the whole case," including the previous evidentiary rulings and Mr. Bailey's ability to present a complete defense (as was his constitutional right).

Instead, the trial court circularly concluded the withheld fingerprint analysis was not relevant by citing to the same Court of Appeals decision that was drafted in a world where the fingerprint analysis was not known to exist. Indeed, the world on direct appeal was one where the prosecutor used the profile reports as a sword by arguing those reports supported Mr. Bailey as a suspect in the earlier homicide, while withholding forensic evidence that excluded Mr. Bailey from that very homicide.[1]

Thereafter, the state trial court continued its erroneous analysis:

---

[1]     And it's not as if that evidence was stuffed away in an unknown case file of an unrelated murder; the fingerprint analysis of the Lintemuth homicide was produced during the investigation of the Pine homicide, because investigators suspected Bailey may have been responsible for both murders. In addition, the profile reports were the subject of the underlying evidentiary dispute on the third-party guilt issue. To withhold very material evidence to that evidentiary dispute that would, at a minimum, be favorable to the defense in the context of that weighty dispute is indefensible.

The addition of evidence showing that Defendant's prints did not match those left at the Lintemuth crime scene does not in any way strengthen Defendant's claim regarding third party guilt. It was after the Mary Pine trial that the set of fingerprints was shown to belong to Scott Graham. The fact that Defendant's fingerprints did not match a particular set of prints left at the Lintemuth crime scene is not material to Defendant's guilt or innocence because this does not show any direct evidence that a third party committed the murder in this case. Indeed, the only relevance of the conviction of Scott Graham for the Lintemuth murder and evidence showing that Defendant's prints did not match those left at the Lintemuth crime scene is directly related to the two police profiles. This additional evidence does nothing to affect the Court of Appeals holding that the police profiles or perceived similarities between the Lintemuth and Pine murders was not enough to bring evidence of third party guilt before the jury. It was not and is not because it continues to be that the set of fingerprints added to the other evidence creates no more than a "mere suspicion, a conjectural inference, excessive remoteness, or an inadequate connection" to support a claim that a third party was responsible for the murder of Mary Pine. *Id.*; [*see also*] *Holmes*, 547 U[.]S[.] 319; *People v*[.] *Kent*, 157 Mich[.] App[.] 780, 793; 404 N[.]W[.]2d 668 (1987).

(ECF No. 64-2 at PageID.850.)

The state trial court used various vacuums to analyze the record: the fingerprint analysis wasn't exculpatory because it (in a vacuum) only excluded Bailey from the earlier murder and said nothing about Bailey's involvement in the later murder; the profile reports weren't admissible in the first place because they (in another vacuum) casted "mere suspicion"; and the sum of the fingerprints with the profile reports together only created "mere suspicion" because the Court of Appeals (in yet another vacuum), unaware of the fingerprint analysis, had held that the profile reports were not admissible.

A *Brady* analysis requires the Court to analyze whether the withheld evidence "put[s] the whole case in . . . a different light." *Strickler*, 527 U.S. at 290. In other words, a proper analysis requires a court to look at the effects of suppression on the "whole case," not

individual pieces of evidence viewed in different vacuums. Even putting aside the trial court's analysis, its ultimate conclusion—"it continues to be that the set of fingerprints added to the other evidence creates no more than," for example, "an inadequate connection' to support a claim that a third party was responsible for the murder of Mary Pine" (ECF No. 64-2 at PageID.850)—is logically, factually, and legally untenable, as the Court will demonstrate. On this, "fairminded jurists could [not] disagree." *Harrington*, 562 U.S. at 101.

Using a proper analysis, this Court must evaluate: a) if the withheld fingerprint analysis would have changed the state court conclusions that the profile reports created a "conjectural inference," standing alone; and b) if so, and the evidence together would have been admitted, if the suppression of the evidence casts any doubt on the fairness of Mr. Bailey's trial.

> 2.   **The profile reports, together with the fingerprint analysis, are exculpatory as to both the earlier *and* the later murder.**

First, the fingerprint analysis *and* the profile reports are together directly exculpatory as to both the earlier *and* later murders. To explain how the Court arrives at this conclusion, it's important to logically map out the conclusion drawn from the reports—in a world with and without the fingerprint analysis as disclosed:

1. Two profile reports conclude that given the community context and crime scene signatures of both crimes, Person A [someone else] or B [Bailey] is, in one of the report's words,[5] "most likely responsible for both [Crimes 1 and 2]." Person B was only ten-years-old during Crime 1; however, despite his age, the State suggests the profile reports *support* that Person B [Bailey] committed Crime 1.[6]

---

[5]      The FBI report's conclusion is relatively more detailed and relevant to the logic here.

[6]      On direct appeal, the State argued that the reports supported Mr. Bailey's guilt in the earlier murder, despite the fact that Bailey was only ten-years-old. (*See* ECF No. 91 at PageID.1006 ("Not only does the MSP report fail to exclude [Petitioner Bailey] as a suspect in the charged murder, *it arguably supports [Petitioner Bailey's] identity* by suggesting that if both murders were committed by the same person, the killer would have been young . . . .").) Of course, the State advanced this argument despite knowing that he was forensically excluded from the earlier murder. That evidences bad faith.

2. Absent any other information other than that in "1", the reports (arguably) cast only a "conjectural inference" that Person B [Bailey] did not commit Crime 2.

3. However, a forensic analysis <u>excludes</u> Person B [Bailey] from Crime 1.

4. In light of "3," the reports conclude that Person A [someone else] "is most likely responsible for both [Crimes 1 and 2]," and not Person B [Bailey].

5. Accordingly, the reports conclude, in light of "3," that Person B [Bailey] "is most likely [not] responsible for . . . Crime[] . . . 2."

This analysis is sound—the final, logical conclusion amounts to much more than a "mere suspicion" or "conjectural inference." It's the State's own profile reports—one from the FBI at Quantico, no less—concluding that Bailey "is most likely [not] responsible for . . . Crime[] . . . 2." *Cf. Bourjaily v. U.S.*, 483 U.S. 171, 179–80 (1987) ("Individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.").

Thus, the fingerprint analysis is *the* logical lynchpin that *confirms* the probative value of the profile reports *and* the fingerprint analysis together for the proposition that either a) Mr. Bailey did not, in fact, commit either murder; or more subtly and cogently, b) the same "true signature" of someone other than Mr. Bailey was left at both crime scenes, and Mr. Bailey could not have left the first signature. *See* David McCord, *"But Perry Mason Made it Look so Easy!": The Admissibility of Evidence Offered by a Criminal Defendant to Suggest that Someone Else is Guilty*, 63 Tenn. L. Rev. 917, 948 (1996) (collecting cases) ("One type of evidence work[s] as a magic charm for defendants, invariably sufficing to produce a reversal for exclusion of the evidence at trial: the defendant is charged with a crime that was

---

On collateral attack, the State now argues that the fact that Bailey was only ten-years-old shows that the addition of the fingerprint analysis would not have altered the original decision of the Court of Appeals. The Court finds this about-face is nonsense, and can only conclude the Court of Appeals at least read and considered the State's (bad-faith) argument in its calculus, even if that argument was not specifically cited.

committed in the same 'signature' manner as other crimes, *i.e.*, the propensity evidence was so strong as to constitute a unique *modus operandi, and* the defendant had evidence that he could not have committed one or more of the other crimes.").

As shown above, it's logically untenable to conclude, as the state trial court did, that "the addition of evidence showing that Defendant's prints did not match those left at the Lintemuth crime scene does *not in any way* strengthen Defendant's claim regarding third party guilt." (ECF No. 64-2 at PageID.850 (emphasis added).)

One other logical error advanced by the State is that the reports *and* the fingerprint analysis *together* are only exculpatory to the earlier homicide. True, the *fingerprint analysis*, standing alone, is only exculpatory as to the earlier homicide. True again, the *profile reports*, standing alone, only cast "a conjectural inference" that Bailey might not have committed the later homicide because he might not have committed the earlier homicide. True finally, for the sake of deference, the profile reports *and* the fact that Bailey was ten at the time of the earlier homicide, may not be sufficiently relevant, particularly if the State argues that the reports support Bailey's guilt of the earlier crime, despite his age. *See supra* note 6; *see also* McCord, *Admissibility of Evidence Offered by a Criminal Defendant, supra*, at 949 ("Defendants claiming exculpation via propensity evidence regularly lose by failing to *negate the possibility* that they perpetrated the other offenses." (emphasis added)). However, as demonstrated above, the reports (given the fingerprint analysis "negate[d] the possibility," *see* McCord, *supra*, at 949, that Mr. Bailey committed the earlier crime) have great probative value and are exculpatory for Mr. Bailey as to the *second murder* and his trial.

Since the "the reviewing court may consider directly *any adverse effect* that the prosecutor's failure to respond *might have had* on the . . . presentation of the defendant's case," *Bagley*, 473 U.S. at 682 (emphasis added), this Court concludes that the profile reports *and* fingerprint analysis, married together, are exculpatory as to *both* the earlier *and* the later homicides. On this, yet again, "fairminded jurists could [not] disagree." *Harrington*, 562 U.S. at 101. The next question, then, is whether the suppression of exculpatory evidence can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435).

### 3.   Prejudice ensued; Mr. Bailey did not receive a fair trial.

The Court concludes that Mr. Bailey did not receive a constitutionally sound trial, *see Crane*, 476 U.S. at 690, because in retrospect, given the suppressed evidence, Mr. Bailey did not have "a meaningful opportunity to present a complete defense." *Id.*; *accord Holmes*, 547 U.S. at 331.[7] However, in order to demonstrate prejudice under *Brady*, the Court still must look to whether the fingerprint analysis can "reasonably be taken to put the whole case in such a different light to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290

---

[7]      Perhaps in a small way, the Court's holding in *Holmes*, 547 U.S. at 329 is in tension with the third prong under *Brady*. In *Holmes*, the Court confirmed that the right to present evidence of third-party guilt is absolute, and evidentiary rules that measure the strength of the evidence of third-party guilt against the strength of other evidence in the case are unconstitutional. By contrast, in order to satisfy the prejudice prong for a *Brady* analysis, a court must implicitly look to the relative strength of the rest of the evidence.
       What happens, then, when the effect of suppression was to deprive an individual of his right to present a complete defense in contravention of *Holmes*, 547 U.S. at 329? *Must* the Court still look to the relative strength of other evidence for prejudice under *Brady* when it would be *prohibited* from doing so at the outset under *Holmes*? If so, and the prosecution had virtually indisputable forensic evidence (like the facts in *Holmes*), then could it be said that a *Brady* violation did not occur when probative evidence of third-party guilt was nonetheless suppressed, like in *Holmes*? This would seem to have the unfortunate result of encouraging suppression of any evidence of third-party guilt in cases where the prosecution otherwise presented very strong evidence of guilt. Thankfully, this case does not present such a quandary.

(quoting *Kyles*, 514 U.S. at 435). In some ways, that test reads harsher than it is. Put another way, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289–90.

The Court must emphasize that the strength of the State's case against Bailey was relatively weak—and certainly much weaker than the case in *Holmes*, 547 U.S. at 319 (a case with "strong forensic evidence"), where the Supreme Court found that the defendant's right to introduce third-party guilt had been abridged.[8]

The State itself in its charging document announced: "The case against Defendant is largely circumstantial in nature." (ECF No. 58-1 at PageID.522.) The Court agrees—and concludes that the circumstantial evidence was not even cumulatively *strong*. Further, each card in the deck was stacked against Mr. Bailey, from a questionable decision admitting 404(b) evidence to the ruling foreclosing him from pointing the finger elsewhere.

Consequently, it's not hard to see how a juror may have found a "reasonable doubt" existed in light of probative evidence, for example, that the same signature of someone other than Mr. Bailey was left at two crime scenes linked by expert profile reports. *See* Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:37 (4th ed. 2013) ("Since the prosecutor bears the burden of proving guilt beyond a reasonable doubt, which includes proving that the *defendant* did the deed (and not someone else), arguably even slight evidence pointing toward another as the guilty party might raise a reasonable doubt.").

---

[8]      In fact, in *Holmes*, the appellant was entitled to a new trial because he did not get to introduce a probative piece of third-party-guilt evidence, despite the fact that the prosecution's other forensic evidence was nearly overwhelming.

Of course today, Mr. Bailey could also point at the person who has since been convicted of the Lintemuth homicide. *See infra* Part IV.A.iv.3.

Nevertheless, the failure to disclose the fingerprint analysis left the Court of Appeals (on direct appeal) to find no abuse of discretion in the profile reports' exclusion because the reports (without the fingerprint analysis) raised only a "conjectural inference" that Person B did not commit Crime 2. *See supra* note 6. That ruling, absent the *Brady* evidence, might be a ruling entitled to AEDPA deference (though a very close call given Mr. Bailey's age). *Cf.* McCord, *Admissibility of Evidence Offered by a Criminal Defendant, supra*, at 949 ("Defendants claiming exculpation via propensity evidence regularly lose by failing to *negate the possibility* that they perpetrated the other offenses." (emphasis added)).

The Court need not, however, definitively decide whether the state courts erred, as a constitutional matter, in a world without the suppressed evidence.[9]

---

[9]     In rejecting Mr. Bailey's third-party guilt claim on direct appeal, the Court of Appeals held, in relevant part:

> In *People v. Kent*, 157 Mich. App. 780, 793; 404 N.W.2d 668 (1987), this Court stated that "evidence tending to incriminate another is admissible if it is competent and confined to substantive facts which create more than a mere suspicion that another was the perpetrator."
>
> Here, defendant is not relying on any direct evidence that another person committed the murder, e.g., someone else was seen driving the victim's car after the killing, someone else was seen entering the home, or someone else made an inculpatory statement. Rather, defendant is arguing that the 1980 murder indirectly shows that someone else committed the charged murder because the same perpetrator necessarily had to be involved in both killings, given the similarities between the crimes. While it may be arguable on some level, we find no abuse of discretion with respect to the trial court's evidentiary ruling. Under the circumstances presented, and considering the similarities between the crimes as well as the differences, a reasonable and principled decision would include one that finds nothing more than the creation of mere suspicion, a conjectural inference, excessive remoteness, or an inadequate connection. Accordingly, reversal is unwarranted.

*People of the State of Mich. v. Bailey*, 2007 WL 2141362, at *7–8 (July 26, 2007) (per curiam).

>     We can infer that the Court of Appeals found the profile reports combined with Bailey's age at the time of the earlier murder were not sufficiently "probative," but neither the trial court nor the Court of Appeals discussed any risk of confusion, harassment, or prejudice. And it's difficult to see how the subject matter in the reports would have had any such adverse effect.

However, in a universe where the fingerprint analysis was disclosed, the analysis would have been the logical lynchpin for *requiring* the trial court to admit the evidence together,

---

Regardless, while the Court of Appeals announced an otherwise acceptable evidentiary rule, it appeared to apply the rule in an unacceptable, restrictive manner just like the state courts in *Holmes*.

The Court of Appeals laid out its evidentiary standard—one relatively low in the third-party guilt context—that excludes evidence that creates "a mere suspicion that another was the perpetrator." However, at the outset of its analysis, the Court of Appeals criticized Mr. Bailey's argument because he was not "relying on any *direct* evidence that another person committed the [Pine] murder . . ." *Id.* (emphasis added). The Court reasoned that "defendant is arguing that the 1980 murder *indirectly* shows that someone else committed the charged murder because the same perpetrator necessarily had to be involved in both killings, given the similarities between the crimes." *Id.* (emphasis added). The Court then acknowledged that Bailey's contention was "arguable on some level," but without any further analysis, concluded: "[W]e find no abuse of discretion with respect to the trial court's evidentiary ruling" because "a reasonable and principled decision would include one that finds nothing more than the creation of mere suspicion, a conjectural inference, excessive remoteness, or an inadequate connection." *Id.*

The Court of Appeals implied that only "direct" (and not "circumstantial"?) evidence would suffice. But the State itself in its charging document announced: "The case against Defendant is largely circumstantial in nature." (ECF No. 58-1 at PageID.522.) And the Court more or less *assumed* that Bailey had, in fact, tried to present "indirect" evidence of his innocence (or third-party guilt), but found that insufficient because he had, at most, only "*indirectly* show[n] that someone else committed the charged murder," instead of providing "direct evidence that another person committed the [charged] murder . . . ." Bailey, 2007 WL 2141362, at *8. Confining a defendant to only producing "direct evidence that another person committed the murder" is likely too restrictive to survive constitutional muster, even with AEDPA deference. There is a wide swath of evidence between that which creates "mere suspicion" and "direct evidence that another person committed the murder." The Court of Appeals thus turned the analysis for whether the evidence is *probative* on its head, requiring a "smoking gun."

An FBI report, prepared in the context of the investigation of the *Pine* homicide, that concludes "one offender is most likely responsible for both crimes" (ECF No. 61-3 at PageID.628)—along with the fact that Bailey was ten-years-old at the time of the earlier crime—likely "raises a reasonable inference as to the defendant's own innocence." *Holmes*, 547 U.S. at 319. This evidentiary package itself does not have to "suffice" to overcome other evidence; and the evidence by itself does not have to raise a "reasonable doubt" so as to demand acquittal as a whole. The evidence of third-party guilt must be analyzed "independently" for "probative value," "undue risk of harassment, prejudice or confusion of the issues." *Id.* at 329.

Moreover, the evidence *excluding* Bailey, while not *directly* implicating a specific party, rises to a level of more than "mere suspicion" given the fact that the FBI report "document[ed] and detail[ed] multiple similarities between the victims' characteristics and deaths," *Bailey*, 2007 WL and concluded that "one offender is most likely responsible for both crimes." (ECF No. 61-3 at PageID.628.)

Finally and most importantly, Mr. Bailey and all the state judges were unaware of the fingerprint analysis that excluded Mr. Bailey from the 1980 crime. By contrast, the Court of Appeals only had the State's dishonest representation that Mr. Bailey could have been responsible for the 1980 murder, when it knew that he was, in fact, not responsible for that murder.

Thus, even if the Court of Appeals did not commit reversible error on the available facts under *Holmes*, the Court of Appeals would have reached a different conclusion with forensic evidence definitively excluding Bailey from the 1980 murder. And of course, given the evidence masked from a *Brady* violation, the reports together with the fingerprint analysis together "undermine confidence" in the verdict.

because a defendant must have "a meaningful opportunity to present a complete defense." *See Holmes*, 547 U.S. at 324 (quoting *Crane*, 476 U.S. at 690).

Armed with the fingerprint analysis from the outset,[10] the state courts would have had to permit Mr. Bailey to present the profile reports (or at least the content of the reports in some form, *see infra* Part IV.iv.1) and fingerprint analysis together as *probative* evidence— "probative" (balanced against "potential adverse effects"), after all, is the constitutional floor, *see Holmes*, 547 U.S. 329—that may have cast a reasonable doubt that Mr. Bailey's signature was left at both scenes. In response to Mr. Bailey's motion for relief from judgment, the trial court's *Brady* analysis—to the extent it was even done—was clearly "contrary to" *Brady* and its progeny and *Holmes*, and it was based on an "unreasonable determination of the facts."

### iv.    Other Ancillary Evidentiary Issues

At oral argument, the State proffered three additional objections to Mr. Bailey's *Brady* claim: 1) the evidence of the other crimes would not have been admissible regardless of the third-party guilt angle, because the reports themselves would have been inadmissible for other reasons including, for example, lack of reliability under *Daubert*; 2) the differences in the crimes would have nonetheless made evidence of the prior homicide not admissible; and 3) Scott Graham, the individual eventually convicted of the earlier, Lintemuth murder was not a plausible suspect for the later, Pine murder.

---

[10] While that conclusion is debatable in light of Mr. Bailey's age, *see supra* notes 6, 9—indeed, the Court of Appeals still found the issue "arguable" the first time around—the State argued to the Court of Appeals that the reports supported Mr. Bailey's identity as the perpetrator in the earlier crime, despite his age. That argument could never have been advanced to the Court of Appeals if the fingerprint analysis had been disclosed. While it's difficult to conclude what weight the Court of Appeals placed on that particular argument, the State demonstrated bad faith and is not entitled to any particular benefit of the doubt in that regard. Further, as Mr. Bailey's counsel pointed out during oral argument, the State requested the fingerprint analysis even when it *knew* about Mr. Bailey's age at the time of the first murder.

The Court finds that the State has waived these arguments because it did not develop any of those arguments in its response to the amended petition. (*See, e.g.*, ECF No. 67 at PageID.903 ("[T]he State would add the following comment to its original Answer. . . . [In response to Petitioner's motion for relief from judgment], the prosecution points out that the profiles were hedged with several disclaimers and also shows that the two murders are not as similar as might appear at first blush. It is also noted that the profiles themselves would have been inadmissible leaving defense counsel to only argue the similarities, such as they were."); *cf. United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). The State does not even assert why, for example, the reports would have been "inadmissible" for all purposes—and Graham is not referenced.

Nonetheless, the Court will briefly respond to those concerns.

### 1. Admissibility of the Reports or Subject Matter in the Reports

First, and most importantly, the constitutional right to "present a complete defense" trumps applications of state evidentiary rules in certain contexts. *See Holmes*, 547 U.S. at 326. The Constitution effectively creates a floor—a defendant must be allowed to present "relevant evidence" of third-party guilt, provided that the evidence is not, for example, "repetitive" and does not "pose[] an undue risk of harassment, prejudice, [or] confusion of the issues." *Id.* (citing *Crane*, 476 U.S. at 689–90). Accordingly, to the extent the unacceptable extension of an otherwise acceptable state rule infringes upon a defendant's right to present a complete defense, the rule as extended must yield to the constitutional floor. *See id.*; *cf.* Stephen Michael Everhart, *Putting a Burden of Production on the*

*Defendant Before Admitting Evidence that Someone Else Committed the Crime Charged: Is it Constitutional?*, 76 Neb. L. Rev. 272 (1997) ("Although these courts use the language of the 'relevancy rules' when discussing the relevancy test, in effect they look to the weight and the sufficiency of the evidence in connecting the third party with the crime charged.").[11]

Second, assuming relevancy (which is undeniable) and, for example, a lack of prejudice (there is none), at least one of several evidentiary avenues would require, if not the reports themselves, at least the reports' *contents* to be admitted through in-court testimony of the authoring witnesses. After all, the state courts did not only refuse to admit the reports—Mr. Bailey was not allowed to even *reference* the other murder or the similar circumstances or signature evidence. Whether the reports themselves were formally admitted alone misses the broader constitutional problem with the exclusion of what is contained *in* the reports—by the trial court's ruling, Mr. Bailey was not allowed to refer to another murder that left the same or similar signature in a small area of a small West Michigan town.

When a report, such as the FBI Quantico report in this case, is based on "specialized knowledge" and opines on crime scene signatures, or "modus operandi," the report's *author* may be called to testify to his opinions at trial. *See, e.g., People v. Prince*, 156 P.3d 1015, 1045 (Cal. 2007) (holding an FBI special agent from the National Center for the Analysis of Violent Crime—the same Center that submitted the report in Mr. Bailey's case—could "testify

---

[11] In practice, this means that the defendant typically faces a lower bar than the prosecution when it comes to 404(b)-type evidence, for example, in large part because of the constitutional consideration of a defendant's right to present evidence of third-party guilt. *See* Mueller & Kirkpatrick, *supra*, § 4:37 ("[D]efense proof of third-party acts or crimes should be admissible if they have significant features in common with the charged offense, even though the resemblance is not so extensive, and the common features are not so rare or unique, that they satisfy the 'signature' standard that applies when such evidence shows the defendant's prior crimes or acts and is offered to prove guilt on a *modus operandi* theory.").

as an expert on crime scene analysis and 'signature crimes'") ("[I]t may aid [jurors] to learn from a person with extensive training in crime scene analysis, who has examined not only the evidence in the particular case but has in mind his or her experience in analyzing hundreds of other cases, whether certain features that appear in all charged crimes are comparatively rare, and therefore suggest in the expert's opinion that the crimes were committed by the same person."); *see also* McCormick on Evidence § 13 (7th ed. 2016) ("[T]he courts frequently allow experienced police officers to testify on such topics as the modus operandi for various crimes . . . ."); *cf.* David C. Ormerod, *The Evidential Implications of Pyschological Profiling*, 1996 Crim. L. Rev. 863, 879 ("The question can be posed as follows: Does the fact that an expert witness is of the opinion that a specific person other than the accused is more likely to be the perpetrator make it more or less likely that the accused committed the crime? It is submitted that, subject to the arguments about reliability . . . the evidence is sufficiently relevant.").

While usually "crime scene" experts are called by the prosecution, Mr. Bailey could call the authoring agents to testify as to their conclusions that cast doubt on Mr. Bailey's guilt—and suggest the signature of someone else was left at both crime scenes; of course, the reports could then be used for recollection or impeachment purposes, as necessary. *See* Mueller & Kirkpatrick, *supra*, § 4:37 (discussing "impeachment by contradiction").

In addition, similar factual evidence of the prior murder could potentially be admitted as a type of reverse-404(b) evidence, even without the reports themselves. *Cf. People v. Major*, 285 N.W.2d 660, 663 (Mich. 1979) ("The distinguishing, peculiar or special characteristics which are common to the acts and thus personalize them are said to be the

defendant's 'signature' which identifies him as the perpetrator, or, if his identity is not contested, negates the suggestion that his behavior in performing the challenged act was unintended, accidental, a mistake, or otherwise innocent.").

But the state courts foreclosed any opportunity to Mr. Bailey, holding that any "reference" to the earlier, similarly signed murder was barred.

Moreover, at least the FBI report *itself* would probably be admissible under one of the many exceptions to the hearsay rule. The first avenue is MRE 803(8)(B).

"Consistent with the intent of Congress, FRE 803(B) should be interpreted to allow the introduction of police reports of matters observed pursuant to duty *when offered by a criminal defendant.*" *Solomon v. Shuell*, 457 N.W.2d 669, 686 n.7 (Mich. 1990) (Boyle, J., concurring, but writing for a majority of four justices in this part) (emphasis in original) (citing *U.S. v. Smith*, 521 F.2d 957 (D.C. Cir. 1975)); *see id.* at 686 n.9 ("Substantial federal authority holds that routine police reports made in a nonadversarial setting are admissible in criminal cases as well . . . ."). This is because "[t]he history of parts (B) and (C) of FRE 803(8) evidence no intent to exclude routine reports that might be generated during a police investigation, but rather to preclude the admission of reports which might *endanger the confrontation rights of a criminal defendant.*" *Id.* (Boyle, J., concurring) (emphasis added); *see People v. Stacy*, 484 N.W.2d 675, 683 (Mich. Ct. App. 1992) ("Rule 803(8)(B)'s prohibition of the use, in criminal cases, of writings reflecting certain matters observed by law enforcement officers is premised upon the concern for a criminal defendant's confrontation rights."); *see also U.S. v. Oates*, 560 F.2d 45, 69 (2d Cir. 1977) ((quoting 120 Cong. Rec. 2389 (1974) (statement of Rep. Dennis)) (noting the amendment was introduced because "in

a criminal case[,] the defendant should be confronted with the accuser to give him the chance to cross examine").

When a criminal *defendant* seeks to introduce police reports, concerns regarding trustworthiness, prejudice, and the Confrontation Clause vanish.[12] Most (if not all) jurisdictions that have considered this issue allow defendants to introduce reports under the equivalent of MRE 803(8)(B). *See* 2 McCormick on Evidence § 296 (7th ed. 2016) ("However, the language of [FRE 803(8)(A)(ii) (the equivalent to MRE 803(8)(B))] appears to prohibit the admission of all records of matters observed in criminal cases, which, if read literally, would exclude use by the defense as well as the prosecution. This meaning is not what Congress had in mind, and the cases have construed the provision to permit the defendant to introduce police reports under (A)(ii)."). And the Michigan Supreme Court, at least through Justice Boyle's dicta, appears to agree. *Shuell*, 457 N.W.2d at 686 n.7.

Likewise, MRE 803(6) provides a possible avenue for admission because these particular reports were not, for example, "prepared for use in litigation." *Attorney General v. John A. Biewer Co., Inc.*, 363 N.W.2d 712, 720 (Mich. Ct. App. 1985); *see, e.g., U.S. v. Carneglia*, 256 F.R.D. 384, 391 (E.D.N.Y. 2009) (collecting cases) ("A criminal defendant may offer police reports under the business records hearsay exception in Federal Rule of Evidence 803(6).") In fact, the profile reports were prepared nearly two decades prior to Mr. Bailey's trial as a part of the ordinary course of crime scene analysis.

---

[12]     And other constitutional concerns, such as a defendant's right to introduce probative evidence of third-party guilt, come into play.

Finally, with respect to reliability, the Michigan Court of Appeals more or less assumed the trustworthiness of the reports as given on direct appeal. The starting point of that court's analysis was the relevance of the contents in the reports to Mr. Bailey's trial. Without knowledge of the fingerprint analysis, the Court concluded that the profile reports were simply not relevant in a trial for Crime 2. In light of the fingerprint analysis, however, it would be utterly illogical to conclude the profile reports were not "relevant." *Holmes*, 547 U.S. at 326; *see supra* Part IV.A.ii.2. Even if the state courts chose, for whatever reason, to hedge on the "relevance" question on 404(b) grounds, the *jury* would probably have to resolve the conditional factual questions. *Cf.* McCormick on Evidence § 53 (7th ed. 2016) (citing *Huddleston v. U.S.*, 485 U.S. 681 (1988) ("In *Huddleston*, the Court held that Rule 104(b) governs the foundational question of whether the accused committed an act of uncharged misconduct proffered under Rule 404(b), for example, another murder allegedly committed with the same distinctive modus operandi.").

All of this is to say that the admissibility of the reports or the underlying facts contained therein is not, as the State suggested at oral argument, in any grave doubt. To the contrary. At bottom, though, the State has waived any objection to the admissibility of grounds other than relevance, and Mr. Bailey is entitled to the full slate of evidentiary bases to admit evidence of the other murder, including the fact that a reliable report based on specialized knowledge of a special agent suggests that someone other than Mr. Bailey's signature was left at the crime scene. These evidentiary issues will ultimately be decided by the state trial judge—this time with all of the information available to the prosecution.

### 2.   The alleged differences between the crime scenes.

In response to the State's second argument—the alleged differences in the two murders—the Court will note that the proffered differences do not exist, at least according to the report. (*See, e.g.*, ECF No. 61-3 at PageID.627 ("[N]o sexual assault of either victim could be established.") ("No ransacking of either resident was evident, and no theft of property from either victim could be established."); PageID.628 ("There is no apparent theft motive displayed in either case.")); *see also supra* note 1.

And several "signature" or "unique" elements were common to the senseless day-time murders of two elderly women whose residences were close in proximity in a small town in West Michigan. (*See, e.g.*, ECF No. 61-3 at PageID.627 (noting "[i]n each case, an electrical cord was wrapped around the neck or face of the victim, but served no apparent useful purpose insofar as cause of death is concerned") (noting that the weapons used were positioned on or near each of the victims' bodies, and "the significance [of the parallel positioning] would be known only to the [single] offender") (noting "[t]he weapons used in both offenses were weapons of opportunity obtained from the victims' homes") (noting "[t]here is no apparent theft motive displayed in either case").)

The general rule, at least for the prosecution, is that "crimes must be so similar as to be a 'signature' of the defendant"; "[i]t is not necessary, however, that the crimes be identical in every detail." *U.S. v. Hamilton*, 684 F.2d 380, 385 (6th Cir. 1982).

And it's difficult to see how the alleged differences—to the extent they even exist—would go to the admissibility of the evidence. Since the crime scenes arguably reflect the same signature, any differences would go to the weight, and not admissibility, of the evidence.

### 3.   Scott Graham's plausible role in the second murder.

Of course, in some respects, *Brady* "prejudice" arguably could not be shown if Scott Graham—the individual convicted of the earlier murder—was forensically excluded from the later murder, just as Mark Bailey was forensically excluded from the 1980 murder. The logical basis for admitting evidence of the earlier homicide—including the expert reports—assumes that the individual whose signature was left at the earlier crime scene could have plausibly left his signature at the later crime scene. Otherwise, if Scott Graham was definitively excluded from being implicated in the later murder (e.g., he was incarcerated at the time), the reports and fingerprint analysis would arguably have zero relevance.

After oral argument, the State submitted a letter noting that "[t]here is no evidence [Scott Graham] ever visited Michigan after April of 1980," based upon the case file of the Lintemuth homicide. (ECF No. 94 at PageID.1024.) As Mr. Bailey notes, this is not evidence "excluding" Mr. Graham's involvement in the Pine homicide. (ECF No. 100 at PageID.1031.) The fact that Mr. Graham was living out of state at the time of the later murder does not render any evidence *irrelevant*—it would simply go to the weight of the third-party guilt evidence. (And it probably would not even attack the weight of the evidence with much force—Mr. Graham, after all, was also living out of state at the time of the 1980 murder.) Unless the State could show beyond peradventure that Mr. Graham could not have committed the later murder, Mr. Bailey has a constitutional right to point the finger in Mr. Graham's direction.

### v. Conclusion: Right to Present a Complete Defense & Third-Party Guilt

For the reasons stated above, Mr. Bailey's objections to the Magistrate Judge's Report and Recommendation as to Issue I are **SUSTAINED**; the Magistrate Judge's Report is **ADOPTED IN PART** and **MODIFIED IN PART** and his Recommendation is **REJECTED** as to Issue I. Mr. Bailey is entitled to a new trial based upon the *Brady* violation in this case, which resulted in a deprivation of Mr. Bailey's right to present a complete defense and when analyzing the case as a whole, undermines the confidence in the verdict.

### B. Petitioner's Right to Effective Assistance of Counsel

Mr. Bailey has preserved essentially two arguments with respect to ineffective assistance of counsel: 1) the failure to timely object to "prejudicial and improper testimony by footprint experts"; and 2) the failure to call expert rebuttal witnesses.

To establish an ineffective assistance claim, the petitioner must prove: (1) that counsel's performance performed below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally fair outcome. A court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (noting that counsel's strategic decisions were difficult to attack). The Court must determine whether, in light of the circumstances as they existed at the time of

counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Moreover, as the Supreme Court has observed, while "'surmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). This double deference is an exceedingly high hurdle to meet. *Id.* at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)) ("[W]hen the two apply in tandem, review is 'doubly' [deferential].").

On balance, as to these issues, the Magistrate Judge's Report and Recommendation is correct in all respects. (ECF No. 83 at PageID.972–977.)

As to the first issue, any objection to the testimony would have been without merit under state law because the all of the testimony with respect to the footwear impressions were admissible as personal observations under MRE 701. (*Id.* at PageID.973–74.)

With respect to the second issue, the Court finds that while a close call, the failure to call the witnesses fell within the realm of acceptable strategy. As the Magistrate Judge noted, "the[] expert testimony could have harmed Petitioner's case by calling attention to their conclusions that footprints at the scene of Ms. Pine's death corresponded to a shoe of the same size and type as Petitioner's." (*Id.* at PageID.976.)

As the Magistrate Judge noted, "Petitioner identifies no Supreme Court case in which causal prejudice has been presumed where defense counsel is present during the proceedings but offers expert reports in lieu of expert testimony, and proceeds to elicit a favorable

concession during cross-examination of the government's expert witness." (*Id.* at PageID.976–77.)

While perhaps not the model of effective assistance, any criticism of the trial tactics with respect to these two issues does not suffice to reverse the state courts in an area with "double deference." *See Harrington*, 562 U.S. at 105.

Mr. Bailey's objections as to Issue II are **OVERRULED**; the Magistrate Judge's Report and Recommendation as to Issue II is **ADOPTED**.

### C. Petitioner's Right to Due Process for Excluding "Other Acts Evidence"

Bailey has a final objection that the evidence of Bailey's prior burglaries were admitted in error. When an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness, it may violate due process and warrant federal habeas relief." *Bush v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Admitting the prior burglaries as evidence certainly prejudiced Mr. Bailey. However, the trial court found the evidence to be more probative than prejudicial to a common "scheme, plan, or system relative to the burglaries." "[T]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Likewise, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Id.*

The Court is concerned that the trial judge did not carefully evaluate whether the evidence supported a *common* "scheme, plan or system." The FBI's profile report, for example, concluded:

> There is no apparent theft motive displayed in either case. Items that cannot be located, however, such as two rings and a pendant belonging to Mary Pine, may have been taken by the offender. If such is, in fact, the case, the reason for taking such items would likely be related to souvenirs for his own use in re-experiencing the event, rather than for financial gain.

(ECF No. 61-3 at PageID.628.) If true, "[t]here was no apparent theft motive displayed in [the Lintemuth homicide]," *id.*, there obviously would have been an insufficient basis for admitting what is otherwise very prejudicial prior-acts evidence—and the State's entire theory of the case would have been called into question. *See supra* note 2. At Mr. Bailey's re-trial, the trial court should endeavor to evaluate this evidentiary ruling anew.

On balance, however, the Court cannot conclude that this evidentiary ruling was unconstitutionally "egregious," because first, "there is no clearly established Supreme Court precedent," *Bugh*, 329 F.3d at 512, to bar the admission of such evidence, and second, the trial court gave a sufficient curative instruction to the jury. (ECF No. 76.)

Accordingly, Mr. Bailey's objection as to Issue III is **OVERRULED**; the Magistrate Judge's Report and Recommendation as to Issue III is **ADOPTED**.

## V.   CONCLUSION

The Court will conclude by summarizing the State's absurdities in this case: the State requested profile reports in the context of investigating the later of two murders that the report found left the same or similar signatures at each scene; the reports concluded it was

likely the same person committed both crimes; the State nonetheless argued that the reports cast "bare suspicion" on Bailey's guilt in state court; but the State hid the fact that Bailey was forensically excluded from the earlier homicide while simultaneously arguing that the reports "arguably support[ed]" Bailey's guilt of the earlier homicide to the state appellate courts. The State now argues on one hand, the issue of third-party guilt was (retroactively) waived, but on the other, the *Brady* violation was not prejudicial because the Court of Appeals correctly concluded on the merits that the evidence of "third-party guilt" was "mere suspicion." Of course, however, neither the trial judge nor the Court of Appeals had the benefit of the fingerprint analysis in the first place and was only left with a blatantly misleading representation.

While the state trial court, when considering Mr. Bailey's *Brady* claim on a motion for relief from judgment, unfortunately accepted all of the State's arguments, that court's order was "contrary to" clearly established case law and erroneously misread the factual record.

The State's evidentiary gymnastics, particularly in the context of a *Brady* violation, must be rejected. If the State's circular reasoning won the day, a ruling would encourage prosecutors not to disclose probative evidence that is necessary for a defendant to have a "meaningful opportunity to present a complete defense."[13]

---

[13]    In this case, if the Court held the failure to disclose the fingerprint analysis was not a *Brady* violation because the fingerprint analysis *alone* was not exculpatory, such a ruling would encourage the State to withhold just enough evidence to not trigger *Brady*, but disclose not quite enough evidence to allow a defendant to present a complete defense, as would be his constitutional right. The withheld information and the disclosed information together would have, in this unique case, created a different evidentiary outcome—allowing Mr. Bailey to present a complete defense—and casted the entire case in a different light.

## ORDER

For the reasons contained in the accompanying opinion, the Court **ADOPTS IN PART** and **MODIFIES IN PART** the Magistrate Judge's Report, and the Court **REJECTS IN PART** and **ADOPTS IN PART** the Magistrate Judge's Recommendation. (ECF No. 83.)

The Court **GRANTS** Petitioner Mark David Bailey's amended petition (ECF No. 57) and **ISSUES** a conditional writ of habeas corpus on Petitioner's first claim. Petitioner's conviction will be vacated and the State of Michigan shall release Petitioner from custody unless he is retried within ninety days from the issuance of this writ.[14]

**IT IS SO ORDERED**.

Date:   September 20, 2016                             /s/ Paul L. Maloney
                                                     Paul L. Maloney
                                                     United States District Judge

---

[14]     "The District Court has power, in a habeas corpus proceeding, to "dispose of the matter as law and justice require." 28 U.S.C. § 2243. "Under the predecessors of this section, this court has often delayed the discharge of the petitioner for such reasonable time as may be necessary to have him taken before the court where the judgment was rendered, that defects which render discharge necessary may be corrected." *Irvin v. Dowd*, 366 U.S. 717, 729 (1961) (citing *Mahler v. Eby*, 264 U.S. 32, 46 (1924)).